No. 21-1312

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

---

MICHAEL GIBSON MUIR,

*Plaintiff-Appellant*

v.

UNITED STATES TRANSPORTATION
SECURITY ADMINISTRATION, et al.,

*Defendants-Appellees*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS

---

BRIEF OF APPELLANT MICHAEL GIBSON MUIR

---

MICHAEL GIBSON MUIR
19 Inglewood Lane
Bloomington, IL 61704
muirone@yahoo.com
712-309-6121

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................ii

JURISDICTIONAL STATEMENT .........................................................1

STATEMENT OF THE ISSUE ..............................................................1

STATEMENT OF THE CASE ...............................................................1

    Statement of Facts ...........................................................................1

    Procedural History ..........................................................................1

SUMMARY OF THE ARGUMENT .......................................................3

STANDARD OF REVIEW ....................................................................4

ARGUMENT .......................................................................................5

I.      DISMISSAL IS IN ERROR ........................................................5

    Muir's inartful *pro se* Pleadings are liberally Construed .....................5

    An Error of Omission: Overlooking § 1983 in the Trial Court ...............9

    A Matter for the Jury: Conspiracy under 42 U.S.C. § 1983 ................10

    A Systemic Legal Error: Judgment and Disposition are in Error .........11

    A Failure to Grant Leave to Amend: Contradicting Fed. R. Civ. P. 19 ...........11

    **AMENDMENT IS JUSTIFIED – 2 PRONG § 1983 TEST** .................12

    An Action on Contingency: § 1983 and 49 U.S.C. § 46110 .................12

    A Silent Conspiracy: Defendants' Affirmative Conduct .....................14

    An Issue of Privacy: Advanced Technology and the All-Knowing Government .............17

    **DEPRIVATION OF MUIR'S RIGHTS - PRONG 1** ..........................19

    A Special Relationship: Custodial Interrogation in TSA's Checkpoint Scheme ...........19

    An Inhuman Authority: Artificial Intelligence and Deliberate Indifference ...........20

    Muir's 49 U.S.C. § 46110 Petition for Review of a Final TSA Order ...........21

    **STATE ACTION: PEORIA COUNTY - PRONG 2** ...........................24

    Tortious Misconduct: A Failure to Train and Supervise ....................25

    Official Policy: A Proximate Cause and Moving Force .....................28

CONCLUSION ...................................................................................29

CERTIFICATE OF COMPLIANCE .....................................................30

# TABLE OF AUTHORITIES

**Cases:**                                                                    Page

*Adcock v. Brakegate, Ltd.*, 645 NE 2d 888, 894-895 - Ill: Supreme Court 1994 ..........................15

*Adickes v. SH Kress & Co.*, 398 U.S. 144, 150-152 (1970) ...............................................13, 16, 19

*Arnett v. Webster,* 658 F.3d 742, 751 (7th Cir. 2011).....................................................................5

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) .................................................................................4

*Baker v. McCollan*, 443 U.S. 137, 146 (1979) ..............................................................................9

*Bell v. City of Milwaukee*, 746 F.2d 1205, 1255 (7th Cir.1984).....................................................15

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–57 (2007) ..........................................................4, 5

*Bivens* v. *Six Unknown Fed. Narcotics Agents,* 403 U. S. 388 (1971) ...........................................8

*Blitz v. Napolitano,* 700 F.3d 733, 737 (4th Cir. 2012)  ................................................................21

*Board of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 404-405 (1997) ....................26, 28, 29

*Bonte v. US BANK, NA*, 624 F. 3d 461, 463 (7th Cir. 2010) ..........................................................4

*Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir. 1982) ..................................................................20

*Brower* v. *County of Inyo*, 489 U. S. 593 (1989) ...........................................................................8

*Buchanan-Moore v. Cty. of Milwaukee,* 570 F.3d 824, 827 (7th Cir.2009)  ................................24

*Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F. 3d 732, 736 (7th Cir. 2014) ................................4

*Canton v. Harris*, 489 U.S. 378, 388-389 (1989)  ........................................................................26

*Carpenter v. US*, 138 S. Ct. 2206, 2223 Supreme Court 2018 .......................................................12

*Conley* v. *Gibson,* 355 U. S. 41, 45-46 (1957) .............................................................................8

*Daniels* v. *Williams,* 474 U. S. 327, 330 (1986)  ........................................................................28

*Donald v. Cook County Sheriff's Dept.*, 95 F. 3d 548, 559 (7th Cir. 1996).................................6, 7

*DS v. East Porter County School Corp.*, 799 F. 3d 793, 798 (7th Cir. 2015)...........................24, 25

*Elec. Privacy Info. Ctr. v. DHS*, 653 F.3d 1, 3 (D.C. Cir. 2011) .............................................21, 26

*Estelle v. Gamble*, 429 U.S. 97, 106 (1976) ...............................................................................8

*Griswold v. Connecticut*, 381 U.S. 479 (1965)............................................................................23

*Haines* v. *Kerner,* 404 U. S. 519 (1972) ......................................................................................8

*Hartford Accident & Indemnity Co. v. Sullivan,* 846 F.2d 377, 383 (7th Cir. 1988) ...................15

*In re Text Messaging Antitrust Litigation*, 630 F. 3d 622, 628 (7th Cir. 2010)............................16

*Jones v. City of Chicago*, 856 F. 2d 985, 992 (7th Cir. 1988) ...................................................9, 15

*Katz v. United States*, 389 U.S. 347, 361 (1967) ........................................................................23

*Kent v. Dulles*, 357 U.S. 116, 125 (1958) .................................................................................19

*Monroe* v. *Pape,* 365 U. S. 167 (1961) .....................................................................................19

*Narvaez v. Am. Airlines, Inc.*, No. 09-CIV-6397, 2010 WL 5072114, at *2 (S.D.N.Y. Dec. 13, 2010) .........................................................................................................................................19

*Neitzke v. Williams*, 490 U.S. 319, 328-329 (1989) .................................................................8, 11

*Olmstead v. United States,* 277 U.S. 438, 473-474 (1928) ..........................................................12

*Perez v. Fenoglio,* 792 F.3d 768, 776 (7th Cir. 2015) ...................................................................5

*Roland v. Langlois*, 945 F.2d 956, 962 (7th Cir. 1991) ...............................................................11

*Saenz v. Roe*, 526 U.S. 489, 498 (1999) ....................................................................................19

*Smith v. Dart*, 803 F.3d 304, 311 (7th Cir. 2015) ......................................................................6, 7

*Springs v. Stone*, 362 F. Supp. 2d 686, 690 (E.D. Va. 2005) ......................................................14

*Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010) ......................................................5

*Thomas v. General Motors Acceptance Corp.*, 288 F. 3d 305, 307 (7th Cir. 2002).........................3

*United States v. Andolschek*, 142 F.2d 503, 507 (2d Cir.1944) ...................................................15

*United States* v. *Price,* 383 U. S. 787, 794 (1966) ......................................................................16

*United States ex rel. Berkowitz v. Automation Aids, Inc.*, 896 F.3d 834, 839 (7th Cir. 2018) ........5

*Williams v. Seniff*, 342 F.3d 774, 785 (7th Cir. 2003) .................................................................10

## Constitution, Statutes, Rules and Regulations:

U.S. Const. amend. IV ..................................................................................... 19, 23-26

U.S. Const. amend. V ...................................................................................... 19, 23-26

U.S. Const. amend. XIV ............................................................................ 1, 19, 23-26

U.S. Const. Right to Privacy ..................................................................... 16, 18, 23-26

28 U.S.C. § 2680(a) .................................................................................................. 14

29 U.S.C. § 794 ............................................................................ 17, 18, 23, 24, 26-29

42 U.S.C. § 1983 ................................................... 1, 3-6, 8-16, 22, 24, 26, 29

49 U.S.C. § 114(r) .................................................................................................... 21

49 U.S.C. § 40103(a)(2) ........................................................................................ 22, 26

49 U.S.C. § 44901(l)(1)(A)(i) ............................................................................ 17, 23, 26

49 U.S.C. § 46110 ................................................................................................ 21, 22

49 C.F.R. § 1520.5(b)(9)(i) ..................................................................................... 21

FED. R. CIV. P. 12(b)(6) .......................................................................................... 2, 6

FED. R. CIV. P. 19 ............................................................................................ 3, 6, 11

FED. R. CIV. P. 21 ..................................................................................................... 6

## Other Authorities:

Federal Civil Jury Instructions of the Seventh Circuit .................................................. 10

GAO-14-704G Federal Internal Control Standards ...................................................... 23

OMB Circular A-123 ................................................................................................. 23

## JURISDICTIONAL STATEMENT

Except for appellees' contention that Amendment XIV to the United States Constitution was not implicitly raised in the trial court, Muir hereby affirms the accuracy and completeness of "Appellees' Joint Docketing Statement".

## STATEMENT OF THE ISSUE

Although a *pro se* plaintiff implicitly names a widely-accepted state actor defendant in the body of his complaint and explicitly alleges state action during his motion practice, the District Court does not construe a § 1983 cause of action but instead grants defendants' motions to dismiss despite two Seventh Circuit reported cases against the dismissal of such an anomaly. The question is: Whether the District Court erred in granting defendants' motions to dismiss.

## STATEMENT OF THE CASE

**Statement of Facts**

*Pro se* plaintiff Muir brought this action after two incidents at TSA airport checkpoints in Maricopa County, Arizona and Peoria County, Illinois in August 2018. The District Court did not construe a United States Constitution Amendment XIV claim or a 42 U.S.C. § 1983 cause of action based on Muir's pleadings.

**Procedural History**

After filing federal tort claims with Defendant TSA, Muir brought the action in Maricopa County Superior Court. Defendant L3 removed to District of Arizona. Muir brought the action in Central District of Illinois, voluntarily dismissed the District of Arizona action, and amended his complaint once as a matter of course.

1

The holdings set forth by the District Court on January 22, 2021 in Doc. 46, "Order and Opinion" (Appx. 1-40), and presented here for review by this Court of Appeals are:

<u>Dismissal in Error</u> - "In sum, Defendant Allegiant Air's... Motion to Dismiss for Failure to State a Claim Pursuant to Rule 12(b)(6) is granted." (Appx. 23). "In sum, the Federal Defendant's Motion to Dismiss (doc. 33) is granted" (Appx. 33). "In sum, Defendant L3's Motion to Dismiss is granted." (Appx. 40).

<u>Overlooking § 1983</u> - "It appears Plaintiff claims Defendant Allegiant Air committing the alleged torts by infringing various constitutional rights. While a claim could conceivably sound in both tort and constitutional law, "[m]ost rights secured by the Constitution are protected only against infringement by governments, so . . . the conduct allegedly causing the deprivation of a federal right [must] be fairly attributable to the State." (Appx. 7 n. 3). "As was the case with the claims asserted against Defendant Allegiant Air, the Court finds Plaintiff's claims against Defendant L3 sound in tort, despite invoking various constitutional principles." (Appx. 33 n. 15). "As most of his claims against the Federal Defendants are premised on constitutional and statutory law...his arguments are misplaced." (Appx. 27).

<u>§ 1983 Conspiracy</u> - "Both the First Amended Complaint and Plaintiff's Response fail to explain how the actions of Defendant Allegiant Air, a private corporation, may be fairly attributable to a state government or to the federal government. Rather, Plaintiff's Response only discusses tort. The Court will therefore treat Plaintiff's claims as tort claims, not constitutional claims." (Appx. 7 n. 3). "Plaintiff fails to explain how the actions of Defendant L3, a private corporation, may be fairly attributable to a state government or to the federal government." (Appx. 33 n. 15). "[T]he Amended Complaint... discusses a hodgepodge of matters, asserting at various points... he had a

special relationship with Defendant L3 and there was a common enterprise among Defendants L3, TSA, and Allegiant Air." (Appx. 38).

Judgment and Disposition in Error - "This matter is terminated and judgment shall enter in favor of all defendants." (Appx. 40).

Failure to Grant Leave to Amend - "Given Defendant Allegiant Air's total lack of participation in the conduct which allegedly caused Plaintiff emotional distress, the Court finds any amendment would be futile." (Appx. 23). "Because the Court finds substituting the United States for Defendant TSA would be futile, the Court will not allow Plaintiff leave to amend Counts I–IV." (Appx. 33). "Given Plaintiff had no direct interaction with Defendant L3, the Court finds amendment would be futile." (Appx. 39).

## SUMMARY OF THE ARGUMENT

The District Court erred in granting defendants' motions to dismiss. The Court's order (Doc. 46) should be reversed and Muir's action should be remanded so it can be heard on its merits under 42 U.S.C. § 1983. The trial judge made an error of omission in overlooking both a state actor defendant and § 1983 cause of action in Muir's *pro se* pleadings, and this error was a red-flag inconsistency because "it is intolerable to have the law differ from district judge to district judge" *Thomas v. General Motors Acceptance Corp.*, 288 F. 3d 305, 307 (7th Cir. 2002).

Muir's action was wrongfully dismissed in opposition to Fed. R. Civ. P. 19 because while he did not name the indispensable, widely-accepted state actor defendant in the caption of his action, he implicitly named Peoria County as a state actor defendant in the body of his *pro se* complaint and explicitly alleged state action during his motion practice. There are two Seventh Circuit reported cases against the District Court's granting of dismissal of such an anomalous

action and this Court of Appeals should intervene and set matters right as Muir is not an attorney, not required to set forth all complex legal theories, and has pleaded enough factual content for the Court to infer a 42 U.S.C. § 1983 cause of action. The trial judge's error of omission is also a systemically fatal legal error that undercuts the District Court's entire chain of reasoning set forth in Doc. 46, "Order and Opinion". Since the District Court's granting of the defendants' motions to dismiss was a legal error, and the termination of the action and the entry of final judgment in favor of all defendants were both based on the erroneous granting of the defendants' motions to dismiss, the termination of the action and final judgment are, consequently, also erroneous.

Therefore, the Court's January 22, 2021 order (Doc. 46) should be reversed and Muir's action should be remanded to the Honorable District Court so it can be heard on its merits under § 1983 with indispensable state actor defendant Peoria County named in the caption and an explicit § 1983 conspiracy charge to include all other previously named defendants.

## STANDARD OF REVIEW

A district court's decision to grant a motion to dismiss is reviewed *de novo. Bonte v. US BANK, NA*, 624 F. 3d 461, 463 (7th Cir. 2010), *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F. 3d 732, 736 (7th Cir. 2014). To survive dismissal pursuant to Rule 12(b)(6), the complaint must contain a short and plain statement of the plaintiff's claim sufficient to plausibly demonstrate entitlement to relief. Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–57 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A plaintiff is not required to anticipate defenses or plead extensive facts or legal theories; rather, the complaint need only contain enough facts to

4

present a story that holds together. *Twombly*, 550 U.S. at 570; *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010). On review of a Rule 12(b)(6) motion, the Court construes the complaint in the light most favorable to the plaintiff. *United States ex rel. Berkowitz v. Automation Aids, Inc.*, 896 F.3d 834, 839 (7th Cir. 2018). This means the Courts accepts all well-pleaded factual allegations as true and draws all reasonable inferences from those facts in favor of the plaintiff. *Id.* Moreover, *pro se* complaints must be construed liberally and held to a "less stringent standard than formal pleadings drafted by lawyers." *Perez v. Fenoglio*, 792 F.3d 768, 776 (7th Cir. 2015). *(quoting Arnett v. Webster, 658 F.3d 742, 751 (7th Cir. 2011))*.

## ARGUMENT

**I.    DISMISSAL IS IN ERROR.** The District Court erred in granting defendants' motions to dismiss. This error was both a fatal, systemic legal error and a demonstration of how it's very dangerous for trial courts to inconsistently apply the law, especially when it leads to a premature denial of the opportunity for justice for an unrepresented party. Based on the pleadings and the reasonable inferences drawn from those pleadings, Muir has stated a claim upon which relief can be granted and the Court's January 22, 2021 order (Doc. 46) should therefore be reversed.

### Muir's inartful *pro se* Pleadings are liberally Construed

How could the District Court overlook a § 1983 cause of action? *Pro se* complaints are liberally construed and Muir has told a story that holds together and pleaded facts that entitle him to relief. He is not required to plead extensive facts, such as the complete inner-workings and organizational structure of the TSA airport checkpoint scheme, or legal theories, such as a total understanding of a complex common venture involving the federal government, two local law enforcement state actors, two multi-billion dollar corporations, proprietary advanced imaging

technology, artificial intelligence and a highly sensitive TSA Standard Operating Procedure which the trial judge in the case could not even view when ruling on defendants' motions to dismiss. On review of a Rule 12(b)(6) motion, the Court construes the complaint in the light most favorable to the plaintiff and draws all reasonable inferences from those facts in favor of the plaintiff. An implied § 1983 cause of action in Muir's *pro se* pleadings is a critical point that never should have been left behind by the trial judge and the District Court's failure to draw the reasonable inferences that both the federal government (Appx. 44, raising 28 [sic] § 1983) and the Central District of Illinois Clerk's Office (Appx. 45, classifying Muir's action as 42 U.S.C. § 1983) drew, and that Muir and all appellees' agree on (see Case No. 21-1312, Doc. 12, agreeing that § 1983 was raised in the trial court), cannot be said to be in favor of Muir, especially since the failure resulted in final dismissal and termination of the matter.

Peoria County is a state actor enforcing federal law at the airport checkpoint (this state action was explicitly identified by Muir during motion practice (Appx. 42)), see *Smith v. Dart*, 803 F.3d 304, 311 (7th Cir. 2015), and Muir implicitly named Peoria County as a defendant in the body of his *pro se* complaint (Appx. 41), see *Donald v. Cook County Sheriff's Dept.*, 95 F. 3d 548, 559 (7th Cir. 1996). Muir's failure to name the exact legal municipal entity, Peoria County, does not negate the fact that Peoria County walks hand in hand with TSA and L3's A.I. to enforce federal law at the TSA airport checkpoint. Common law duty is irrelevant to § 1983 statutory liability as a co-conspirator and Muir should have been granted the opportunity under Fed. R. Civ. P. 19 and Fed. R. Civ. P. 21 to amend his complaint in order to properly conform his pleadings to meet the legal requirements of a valid cause of action before the final dismissal and termination of his action, and the failure to construe Muir's pleadings liberally was a legal error that led directly to a failure to grant leave to amend before dismissal.

"As we have noted, *pro se* complaints are to be liberally construed, and courts may construe them as having named defendants who are mentioned only in the body of the complaint." *Donald v. Cook County Sheriff's Dept.*, 95 F. 3d 548, 559 (7th Cir. 1996). Muir stated in paragraph 34 of his First Amended Complaint: "Muir had no criminal record and had never been arrested or charged with any crime or offense and strongly desired to keep his reputation intact and to not be arrested and sent to jail, especially considering he had followed all laws, rules, procedures and TSA personnel instructions" (Appx. 41). The only entity in the TSA airport checkpoint scheme with the power to deprive Muir of his liberty through arrest under color of law is Peoria County. Therefore, the Court should have construed Peoria County as an indispensable state actor defendant because failure to do so resulted in final dismissal of Muir's action.

"[F]acts alleged . . . in a brief in opposition to a motion to dismiss may be considered when evaluating the sufficiency of a complaint so long as they are consistent of the allegations in the complaint," *Smith v. Dart*, 803 F.3d 304, 311 (7th Cir. 2015) (internal quotation marks omitted). Muir stated in motion practice with Defendant Allegiant: "Allegiant and TSA rely on local law enforcement officers at the airport to enforce the federal regulations regarding the checkpoint because TSA does not have arrest powers. This constitutes State action in both Illinois and Arizona... because Muir faced arrest by local law enforcement if he failed to follow TSA orders while in TSA control" (Appx. 42), and in his motion practice with Defendant Federal Defendants: "Muir was...forced to choose a punishment (arrest, criminal prosecution and civil fines or allow a TSO with no medical training to apply pressure to the exact site of his serious and painful medical emergency) in order to secure his lawful release from TSA control." (Appx. 43). These statements implicitly naming Peoria County as a key element in his unlawful

7

and unconscionable coercion (Muir would have simply walked away from the checkpoint if it weren't for the guarantee of arrest) are consistent with the allegations of the complaint and the complaint does not need to state all possible legal theories. "As the Court unanimously held in *Haines* v. *Kerner*, 404 U.S. 519 (1972), a *pro se* complaint, "however inartfully pleaded," must be held to "less stringent standards than formal pleadings drafted by lawyers" and can only be dismissed for failure to state a claim if it appears " `beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Id.*, at 520-521, quoting *Conley* v. *Gibson*, 355 U. S. 41, 45-46 (1957)." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). As demonstrated below through the § 1983 test (p. 19-28), Muir can prove a set of facts in support of his claim and his inartful pleadings are not a valid reason for dismissal.

"Close questions of federal law, including claims filed pursuant to 42 U. S. C. § 1983, have on a number of occasions arisen on motions to dismiss for failure to state a claim, and have been substantial enough to warrant this Court's granting review, under its certiorari jurisdiction, to resolve them. See, *e. g., Estelle* v. *Gamble*, 429 U. S. 97 (1976); *Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403 U. S. 388 (1971)...we recently reviewed the dismissal under Rule 12(b)(6) of a complaint based on 42 U. S. C. § 1983 and found by a 9-to-0 vote that it had, in fact, stated a cognizable claim. See *Brower* v. *County of Inyo*, 489 U. S. 593 (1989)" *Neitzke v. Williams*, 490 U.S. 319, 328-329 (1989). "[T]he Court can conceive of no possible scenario..." (Appx. 31). The District Court had the power and responsibility to conceive of possible and probable scenarios with regards to Muir's pleadings. Muir implicitly named a widely-accepted state actor, explicitly alleged state action, and inartfully alleged a common enterprise (which, for a *pro se*, is analogous to a conspiracy), and it was a legal error for the trial judge to not conceive of, overlook, and then leave forever behind a 42 U. S. C. § 1983 cause of action.

**An Error of Omission: Overlooking § 1983 in the Trial Court**

"[A] section 1983 constitutional-tort case is still a tort case" *Jones v. City of Chicago*, 856 F. 2d 985, 992 (7th Cir. 1988). "As was the case with the claims asserted against Defendant Allegiant Air, the Court finds Plaintiff's claims against Defendant L3 sound in tort, despite invoking various constitutional principles." (Appx. 33 n. 15). "As most of his claims against the Federal Defendants are premised on constitutional and statutory law…his arguments are misplaced" (Appx. 27). Muir's argument is not "misplaced" when analyzed under 42 U.S.C. § 1983 and Muir can prove a set of facts that meet all required elements of a § 1983 cause of action. The Court noted that Muir's claims were "couched in terms of various constitutional rights to privacy, due process, and freedom from unreasonable searches" (Appx. 7 n. 3), and since "Section 1983 imposes liability for violations of rights protected by the Constitution" *Baker v. McCollan*, 443 U.S. 137, 146 (1979), the trial judge erred in overlooking the widely-accepted state actor defendant and corresponding § 1983 cause of action in Muir's pleadings.

Peoria County is an indispensable party as its absence directly threatens Muir's interest in the action because a § 1983 cause of action turns upon state action and Peoria County is the sole state actor with the ability to arrest under color of law in the TSA airport checkpoint scheme. Therefore, any legal action resulting from the events of August 12, 2018 at PIA must include the lone state actor in the federal security checkpoint scheme, Peoria County, and the District Court overlooking Muir's corresponding sole legal cause of action is a legal error of omission and an irreconcilable inconsistency that must be reversed as Muir faces ongoing discrimination at the airport, is and has been inhibited from booking and making flights, has exhausted all possible avenues of redress, and all other previously named defendants' liability rests on each defendant's status as an affirmative participant in a silent conspiracy under a § 1983 conspiracy charge.

**A Matter for the Jury: Conspiracy under § 1983**

The District Court held that "Given Defendant Allegiant Air's total lack of participation in the conduct which allegedly caused Plaintiff emotional distress…" (Appx. 23), and "Given Plaintiff had no direct interaction with Defendant L3" (Appx. 39), and although "[T]he Amended Complaint… discusses a hodgepodge of matters, asserting at various points… he had a special relationship with Defendant L3 and there was a common enterprise among Defendants L3, TSA, and Allegiant Air." (Appx. 38), Muir had failed to state a claim upon which relief could be granted. The word "conspiracy" has never before been explicitly used in this case (Muir has thus far referred to the TSA airport checkpoint scheme as an interstate commerce, common calling, public-private common enterprise controlling access to the airport sterile area) and § 1983 was first explicitly raised in the pleadings by Defendant Pekoske in his motion to dismiss (Appx. 44). "[T]o establish § 1983 liability through a conspiracy theory, "a plaintiff must demonstrate that: (1) a state official and a private individual(s) reached an understanding to deprive the plaintiff of his constitutional rights, and (2) those individual(s) were willful participant[s] in joint activity with the State or its agents.");  *Williams v. Seniff*, 342 F.3d 774, 785 (7th Cir. 2003).

A defendant's affirmative conspiratorial conduct is, under a § 1983 cause of action, a matter for the jury to decide (see 7th Cir. Jury Instruction 7.03(b)). Therefore, the District Court made a legal error in concluding that defendants did not participate in the conduct that injured Muir because it was not the trial judge's decision to make. And due to the District Court's failure to properly construe an implied § 1983 cause of action and corresponding common venture conspiracy from Muir's pleadings, Muir's action must be remanded so that his conspiracy theory may be put to a jury in in order to determine if defendants' conduct rises to the level of "parallel plus" affirmative conduct.

**A Systemic Error: Judgment and Disposition are in Error**

"This matter is terminated and judgment shall enter in favor of all defendants." (Appx. 40). The District Court erred in finding in favor of all defendants and terminating Muir's action because both conclusions were based on the Court's legal error in granting defendants' motions to dismiss. Therefore, this Court of Appeals should reverse the District Court's erroneous legal conclusions with regards to final judgment and termination and remand Muir's action to the district court to be heard on its merits under a § 1983 cause of action.

**A Failure to Grant Leave to Amend: Contradicting Fed. R. Civ. P. 19**

"Generally, to preserve an issue for appeal, it must first be raised to the trial court. *See Roland v. Langlois*, 945 F.2d 956, 962 (7th Cir. 1991)" (Doc. 54, pg. 3). 42 U.S.C. § 1983 was raised in the trial court and "The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). "Unless there is '"indisputably absent any factual or legal basis"' "for the wrong asserted in the complaint, the trial court, "[i]n a close case," should permit the claim to proceed at least to the point where responsive pleadings are required." *Neitzke v. Williams*, 490 U.S. 319, 323 (1989). This is a § 1983 case and the trial judge made a legal error by not allowing Muir to amend his pleadings before final dismissal and by not permitting the claim to proceed to the point where responsive pleadings were required with regards to state action, 42 U.S.C. § 1983 and the automatic triggering of the Equal Protection Clause of the Fourteenth Amendment.

Peoria County is an indispensable party to Muir's action, whose joinder would not have deprived the Court of subject matter jurisdiction, and therefore should have been joined because, as stated in Fed. R. Civ. P. 19(A) "in that person's absence, the court cannot accord complete relief among existing parties; or (B) that person claims an interest relating to the subject of the

action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest". Muir has no other remedy and Peoria County official policy is and has been directly inhibiting Muir from making flights since his last time traveling through PIA on June 9, 2019 and his cause of action turns on Peoria County's official municipal policy executed in its participation in the TSA airport checkpoint.

**AMENDMENT IS JUSTIFIED – 2 PRONG § 1983 TEST.** The District Court erred in concluding that amendment was futile. The Court erred because it based its conclusion that amendment was futile on the findings that Allegiant didn't participate in the conduct that harmed Muir and that Defendant L3 had no direct interaction with Muir, and this is a fatal flaw in the District Court's reasoning because a finding regarding defendants' participation in conduct causing harm to Muir under a 42 U.S.C. § 1983 conspiracy is a matter reserved for the jury.

**An Action on Contingency: 42 U.S.C. § 1983 & 49 U.S.C. § 46110**

"As Justice Brandeis explained in his famous dissent, the Court is obligated — as "[s]ubtler and more far-reaching means of invading privacy have become available to the Government" — to ensure that the "progress of science" does not erode Fourth Amendment protections. *Olmstead v. United States,* 277 U.S. 438, 473-474, 48 S.Ct. 564, 72 L.Ed. 944 (1928). Here the progress of science has afforded law enforcement a powerful new tool to carry out its important responsibilities. At the same time, this tool risks Government encroachment of the sort the Framers, "after consulting the lessons of history," drafted the Fourth Amendment to prevent. *Di Re,* 332 U.S., at 595, 68 S.Ct. 222." *Carpenter v. US*, 138 S. Ct. 2206, 2223 Supreme Court 2018. The tool in the instant case is L3's unmonitored artificial intelligence (Appx. 47 paragraph 18, Appx. 49), the encroachment on Muir's privacy was made possible only by

12

advanced technology and the "progress of science", and defendants' use of Muir's most private health information against him under color of law during a custodial interrogation was unlawful and in ways which the Framers intended to prevent.

"The terms of § 1983 make plain two elements that are necessary for recovery. First, the plaintiff must prove that the defendant has deprived him of a right secured by the "Constitution and laws" of the United States. Second, the plaintiff must show that the defendant deprived him of this constitutional right "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory." *Adickes v. SH Kress & Co.*, 398 US 144, 150-152 (1970). Even though the district court does not have jurisdiction over constitutional claims "inescapably intertwined" with the TSA SOP (Appx. 28), Muir's pleadings must still be liberally construed to include a § 1983 cause of action, which in the instant case happens to contain a first-element test prong dependent on the legality and constitutionality of certain provisions of the TSA SOP that only this Court of Appeals can decide, which makes Muir's SOP challenge proper and necessary.

The Court should have analyzed Muir's pleadings under § 1983 before final dismissal because it was raised in the trial court by Defendant Pekoske (Appx. 44) and the Clerk's Office construed Muir's complaint as a 42 U.S.C. § 1983 prisoner's rights claim (even though Muir was never arrested and never a prisoner) and Muir and all appellees agree that 42 U.S.C. § 1983 was raised in the trial court. Therefore, Muir should have been granted leave to amend to conform his pleadings to a valid legal cause of action under § 1983 before final dismissal and since the first element of the § 1983 test can only be ruled on by this Court of Appeals, Muir's instant appellant brief is the proper place to raise such issues (see p. 21-24) in order for the Court to determine if remand with leave to amend is indeed futile or if Muir's cause of action must proceed back to the trial court for him to prove the § 1983 test's second required element, state action (see p. 24).

**A Silent Conspiracy: Defendants' Affirmative Conduct**

Although Muir's pleadings present a new, advanced technology twist on a § 1983 cause of action, Muir's requested relief is in line with prior jurisprudence and this case is a natural evolution and extension of the law based on recent technological advances that are within the scope of the founders' vision of privacy and the Fourth Amendment. "Not on our Watch" is TSA's current slogan. These four words could also summarize TSA's mission as it has been held that "[t]he most essential aspect of civil transportation security… for which TSA is accountable, is improving airport security to prevent a reprise of the tragic events of September 11, 2001." *Springs v. Stone*, 362 F. Supp. 2d 686, 690 (E.D. Va. 2005). Eliminating terrorism is a noble end, and defendants had a clear and powerful motive to accomplish their congressionally-mandated objective, but the commission of a lawful act by unlawful means cannot be tolerated if an individual from a protected class gets hurt by a federal officer's decision that is not discretionary under 28 U.S.C. § 2680(a) and that creates a foreseeable danger the protected individual was never warned of and could not unilaterally avoid. And of course the end cannot justify the means because the end is never actually reached and we are then forced to live only with the means, and the outrageous, dehumanizing, privacy-invading means in this case are unconscionable in a civilized society. State actors cannot break federal law in order to enforce it and super-carelessness cannot be the standard with regards to an unmonitored and unreviewable artificial intelligence that process Muir's most private health information in a custodial interrogation situation completely unrelated to his congenital physical disability or his health care.

"[T]he function of conspiracy doctrine is merely to yoke particular individuals to the specific torts charged in the complaint. The requirements for establishing participation in a conspiracy are the same, however, as in a case (criminal or civil) in which conspiracy is a

14

substantive wrong." See *Hartford Accident & Indemnity Co. v. Sullivan,* 846 F.2d 377, 383 (7th Cir.1988). "To be liable as a conspirator you must be a voluntary participant in a common venture, although you need not have agreed on the details of the conspiratorial scheme or even know who the other conspirators are. It is enough if you understand the general objectives of the scheme, accept them, and agree, either explicitly or implicitly, to do your part to further them. See, e.g., *id.* at 383-85; *Bell v. City of Milwaukee,* 746 F.2d 1205, 1255 (7th Cir.1984); *United States v. Andolschek,* 142 F.2d 503, 507 (2d Cir.1944) (L. Hand, J.)." *Jones v. City of Chicago,* 856 F. 2d 985, 992 (7th Cir. 1988). To a *pro se* such as Muir, the core concept underlying a silent conspiracy with "parallel plus" conduct is the same idea as a common enterprise, with the words "venture" and "enterprise" being synonymous. It is nonsensical to think that Muir could be expected to fully comprehend, without taking any discovery, a very complex national security scheme that included advanced imaging technology, proprietary artificial intelligence, sensitive security information, an untested liability waiver (Appx. 47 paragraph 15), and was undoubtedly the evolving product of the work of many skilled attorneys over many years. Muir pleaded the facts necessary to state a claim that entitles him to relief under § 1983 and it is undisputed that TSA does not have arrest powers and that the sole agency in the TSA Checkpoint scheme with the power to arrest under color of law is local law enforcement. This is state action and since Muir explicitly alleged this conduct as such in his motion practice, it is reasonable and proper to construe a 42 U.S.C. § 1983 conspiracy from his pleadings.

"Once a defendant knowingly agrees with another to commit... a lawful act in an unlawful manner, that defendant may be held liable for any tortious act committed in furtherance of the conspiracy, whether such tortious act is intentional or negligent in nature." *Adcock v. Brakegate, Ltd.,* 645 NE 2d 888, 894-895 - Ill: Supreme Court 1994. "A private party involved in

such a conspiracy, even though not an official of the State, can be liable under § 1983."Private persons, jointly engaged with state officials in the prohibited action, are acting `under color' of law for purposes of the statute. To act `under color' of law does not require that the accused be an officer of the State. It is enough that he is a willful participant in joint activity with the State or its agents," *United States* v. *Price*, 383 U. S. 787, 794 (1966)." *Adickes v. SH Kress & Co.*, 398 U.S. 144, 150-152 (1970). "A footnote in *Twombly* had described the type of evidence that enables parallel conduct to be interpreted as collusive: …`conduct [that] indicates the sort of restricted freedom of action and sense of obligation that one generally associates with agreement.'" *In re Text Messaging Antitrust Litigation*, 630 F. 3d 622, 628 (7th Cir. 2010).

Muir will put to a jury the theory that Defendants entered into an implicit, silent, "meeting of the minds" conspiracy to knowingly, willingly and deliberately use advanced technology to violate Illinois law, federal law and air travelers' constitutional right to privacy in order to further their mission of preventing terrorist attacks in the transportation sector.

Defendants' conduct was unreasonable because it included a contradictory profit motive in the custodial special relationship that was directly related to L3's proprietary ATR software performance and because Muir's injuries were a foreseeable consequence of the defendants' deliberate indifference to federal law as he is in a protected class of persons with disabilities who deal with challenges in transportation and have been explicitly protected by federal statute at federal facilities of interstate commerce. Defendants' deliberate indifference to known, terrible A.I. performance combined with the complete failure to train security checkpoint agents and state actor participants on 29 U.S.C. § 794 or in any way monitor the unreviewable artificial intelligence software that controls the custodial interrogation is incompetent, reckless and unlawful conduct. Defendants participated in the conspiracy through the following voluntary

conduct: 1) Defendant United States: PIA TSA Supervisor John Doe 1's failures to train on Section 504 and to supervise the A.I. in use at the checkpoint are not discretionary due to the state-created danger safety exception. 2) Defendant Pekoske: As an officer sworn to defend the Constitution, his failure to supervise L3's A.I. violates federal "green book" standards and his failure to train the artificial intelligence in the legal mission parameters of the checkpoint search violates federal law, the U.S. Constitution and is not discretionary due to the special relationship and state-created danger doctrines. 3) Defendant Allegiant: Common Carrier responsible for collection of the 9/11 Security Fee and its remittance to DHS. 4) Defendant L3: Owned the proprietary A.I. used by TSA in checkpoint screening and acknowledged the potential for injury through its Safety Act application. 5) Implied Defendant Peoria County: Sole entity at the TSA Checkpoint with the power to arrest under color of law for violating TSA personnel directives.

### An Issue of Privacy: Advanced Technology and the All-Knowing Government

Defendants are not Muir's doctor, yet during the security checkpoint threat assessment process, defendants possessed and utilized more information regarding Muir's hidden physical disability than Muir or Muir's doctor ever did. This troubling demonstration of the all-seeing, all-knowing government was made possible only by advanced imaging technology. "The term "advanced imaging technology" means a device used in the screening of passengers that creates a visual image of an individual showing the surface of the skin and revealing other objects on the body." 49 U.S.C. § 44901(l)(1)(A)(i). Advanced imaging technology searches are therefore limited to objects on the surface of the skin and, also, based on the dictionary definitions of words, cannot include human tissue underneath the surface of the skin because the word "surface" means the opposite of the word "underneath", the meaning of the word "on" is the opposite of the meaning of the word "under" and since human tissue underneath the skin cannot,

17

by literal definition, be an object on the body, any search of Muir's internal tissue and organs is unlawful and a violation of his constitutional right to privacy. "Courts recognize that the screening procedures described here are "well-tailored to protect personal privacy," as they "escalat[ed] in invasiveness only after a lower level of screening disclosed a reason to conduct a more probing search." *Hartwell*, 436 F.3d at 180. Moreover, the intrusiveness is further lessened precisely because "air passengers are on notice that they will be searched." (Doc. 33, pg. 15). As a U.S. citizen traveler, Muir has the constitutional right to privacy beneath his skin with regards to his human tissue and the "reason to conduct a more probing search" in the instant case was his human tissue disability which is impermissible to discrimination, and Muir was most definitely not "on notice" that his most private health information could be taken and then used against him during the passenger screening custodial interrogation process. Muir's congenital disability is completely human tissue, completely beneath his skin, completely consistent with his expected reproductive anatomy, and his choice to not have surgery is protected by his right to privacy, his right to marital privacy, and his right to marital privilege, and he is only discriminated against because of his choice to not have surgery. During the threat assessment process, a control group of men with groin hernias who decided to have surgery are not discriminated against, but Muir is discriminated against solely for his private marital healthcare choice regarding the treatment of his congenital disability. The sole reason for the false threat alarms at Muir's right groin on August 9 and August 12, 2018 was the uncontrollable symptom manifestation of his human tissue disability beneath his skin and this demonstrates a violation of the search parameters for the passenger screening data image search established by Congress, a violation of Muir's right to privacy, and a violation of 29 U.S.C. § 794 and the Equal Protection Clause because Muir cannot be discriminated against solely due to his disability while participating in a federal program.

18

**DEPRIVATION OF MUIR'S RIGHTS – PRONG 1.** The District Court erred in failing to construe an Equal Protection Clause claim as Muir implicitly raised U.S. Constitution Amendment XIV in the trial court. "The involvement of a state official in such a conspiracy plainly provides the state action essential to show a direct violation of petitioner's Fourteenth Amendment equal protection rights, whether or not the actions of the police were officially authorized, or lawful"; *Monroe* v. *Pape,* 365 U. S. 167 (1961)." *Adickes v. SH Kress & Co.*, 398 U.S. 144, 150-152 (1970). Muir implicitly named a widely-accepted state actor in his complaint, explicitly alleged state action in his motion practice, implicitly alleged conspiracy throughout the proceedings and has pleaded the state action essential to show a direct violation of his Fourteenth Amendment equal protection rights.

### A Special Relationship: Custodial Interrogation in TSA's Checkpoint Scheme

"It is undisputed that "the right to travel is a part of the 'liberty' of which the citizen cannot be deprived without the due process of law under the Fifth Amendment." *See Kent v. Dulles*, 357 U.S. 116, 125 (1958); *see also Saenz v. Roe*, 526 U.S. 489, 498 (1999) (noting that the right to travel is "firmly embedded" within the jurisprudence of the Supreme Court). "[C]ourts have gone so far to characterize the screening area as a purely "federal facility" wholly separate from the airport in general." *Narvaez v. Am. Airlines, Inc.*, No. 09-CIV-6397, 2010 WL 5072114, at *2 (S.D.N.Y. Dec. 13, 2010). The TSA Checkpoint threat assessment process is a custodial interrogation situation automatically triggering protections found in Amendments IV, V, and XIV to the United States Constitution because Muir is completely under TSA control, unable to act in his own best interest and unable to unilaterally end the encounter for any reason, including a serious medical emergency. While securing the nation's transportation systems is an important public interest, the only exception to the public duty rule is the special relationship,

19

and the custodial interrogation setting and use of advanced imaging technology during the TSA threat assessment process requires the special relationship created by that situation to take priority because the United States Constitution is the supreme law of the land and Muir's well-established rights cannot be violated for any reason, including the prevention of terrorism.

Judge Posner stated in *Bowers v. DeVito,* 686 F.2d 616, 618 (7th Cir. 1982): "We do not want to pretend that the line between action and inaction, between inflicting and failing to prevent the infliction of harm, is clearer than it is. If the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit."

Defendants threw Muir into the advanced technology TSA Checkpoint "snake pit" when, without giving him fair notice of the threat assessment process or disclosing known safety risks of the threat assessment process that Muir could not unilaterally avoid, they put him in a position of danger from L3's proprietary A.I. as a non-negotiable term of the contract of carriage and then all turned their backs and deliberately ignored his rights while his privacy and human dignity were violated under color of law, solely because of his physical disability.

### An Inhuman Authority: Artificial Intelligence and Deliberate Indifference

Defendant L3's proprietary artificial intelligence software is an inhuman, unmonitored, and unreviewable corporate entity with total decision-making power at the TSA Checkpoint that Muir cannot hold to account. Corporate person L3's corporate person A.I. non-person software is the final authority when it comes to required pat-downs during the threat assessment process and is a co-conspirator jointly responsible for the deprivation of Muir's liberty at the TSA airport checkpoint. The fundamental flaw in using unmonitored artificial intelligence ATR software to

search passenger data images and generate unreviewable threat alarms that lead to mandatory further interrogation during a threat assessment process that does not include a human in the threat alarm decision-making loop is that the A.I. has no empathy, by definition cannot understand serious medical needs or human disability, and despite all programming efforts to the contrary, cannot understand that it cannot understand human disability. This irredeemable flaw in the very nature of artificial intelligence, mainly the dehumanization of the entire process and the complete disregard of passengers' serious medical needs through the replacement of human judgment and empathy with a soulless, corporate A.I. incapable of understanding what it means to be human or of feeling the guilt, shame and discomfort that dehumanizing a living, breathing person usually generates, makes it by definition indifferent to Muir's serious medical needs and therefore in violation of his well-established rights when he is under TSA control. Muir is a natural, free human being and the deliberate disregard for his serious medical needs due to the introduction of artificial intelligence in an attempt to replace human experience, judgment and empathy with a proprietary software program cannot be tolerated given our country's long history of securing individual liberty and freedom of movement between the several states.

### Muir's 49 U.S.C. § 46110 Petition for Review of a Final TSA Order

The Screening Checkpoint Standard Operating Procedures ("SOP") is a TSA final order that is subject to review in the courts of appeals under 49 U.S.C. § 46110, and pursuant to 49 U.S.C. § 114(r) and 49 C.F.R. Part 1520, the TSA SOP has been designated as "SSI" (sensitive security information) that cannot be publicly disclosed. See 49 C.F.R. § 1520.5(b)(9)(i); *Blitz v. Napolitano*, 700 F.3d 733, 737 (4th Cir. 2012) ("[T]he specifics of [TSA's checkpoint screening] procedures constitute sensitive security information."); *Elec. Privacy Info. Ctr. v. DHS*, 653 F.3d 1, 3 (D.C. Cir. 2011) (noting that "details of the screening process" are "documented in a set of

Standard Operating Procedures not available to the public"). This Seventh Circuit Court of Appeals has jurisdiction over this matter and "The court has exclusive jurisdiction to affirm, amend, modify, or set aside any part of the order." - 49 U.S.C. § 46110. Prong 1 of Muir's 42 U.S.C. § 1983 action is contingent on the following incorporated Petition for Review of a Final TSA Order and this qualifies as a substantial interest because prong 1 can only be ruled on by this Court of Appeals in the first instance (see Appx. 28) under 49 U.S.C. § 46110.

Petitioner Muir is a United States citizen with a hidden congenital physical disorder at his right groin. When Muir exercises his right to travel between the several states by air, as granted by 49 U.S.C. § 40103(a)(2), he cannot know whether the unpredictable and uncontrollable symptoms of his completely human tissue, completely beneath the skin physical disorder at his right groin will manifest to the extent necessary to trigger a false ATR threat alarm at his right groin, which requires TSA conduct a physical "pat-down" to resolve. Muir's requirement that TSA not physically touch his right groin when he is having a medical emergency because it could endanger his life qualifies as a substantial interest and Muir prays the Court will allow his petition to be filed more than 60 days after the TSA SOP was issued because; 1) Muir was not affected by the TSA SOP until August 9, 2018 and, 2) Muir's § 1983 cause of action turns on a determination of the TSA SOP that can only be made by this Court of Appeals, therefore, this constitutes "reasonable grounds" for allowing the petition to be filed past the 60 day time period.

Petitioner Muir challenges the TSA decision to "stand up" the checkpoint AIT program without any oversight of L3's proprietary algorithm. Muir also challenges the TSA decision to exclude from its SOP: 1) an Advanced Imaging Technology ("AIT") medical emergency policy or alternative threat alarm resolution policy for passengers experiencing medical emergencies, 2) the requirement for a warning to passengers that there is no medical emergency policy or

alternative AIT threat alarm resolution policy for passengers with medical emergencies, 3) the requirement for a warning to passengers that a passenger's hidden physical disabilities could, through no fault of his own, be revealed during the screening process, 4) the requirement for a warning to passengers that a passenger's reasonable expectation of privacy could be violated during the checkpoint screening process and, 5) the requirement for a warning to passengers that the security screening cannot be ended for any reason, including a serious medical emergency.

Issues Presented for Review: 1) Whether the search of passenger screening data image ("P.S.D.I.") data regarding the human tissue disorder underneath Muir's skin that generates a false ATR software threat alarm due solely to the unpredictable and uncontrollable symptom manifestation of his physical disability violates 49 U.S.C. § 44901(l)(1)(A)(i), 29 U.S.C. § 794, the Fourth Amendment prohibition on unreasonable searches, the Fifth Amendment Due Process Clause, the Fourteenth Amendment Equal Protection Clause and Muir's right to privacy as found in *Griswold* and *Katz*. 2) Whether moving Muir for additional mandatory interrogation based solely on a false ATR threat alarm, which itself is based solely on Muir's physical disability, violates 29 U.S.C. § 794, the Fourth Amendment's prohibition on unreasonable seizure, the Fifth Amendment's Due Process Clause, and the Fourteenth Amendment's Equal Protection Clause. 3) Whether the decision to not monitor L3's proprietary ATR artificial intelligence software violates GAO-14-704G Federal Internal Control Standard 12.05 ("green book" pg. 56), OMB Circular A-123, 29 U.S.C. § 794, the Fourth Amendment prohibition against unreasonable search, and the Fifth Amendment Due Process Clause. 4) Whether the decision to not train on 29 U.S.C. § 794 as part of the SOP violates the Fourth Amendment prohibition against unreasonable search and seizure, the Fifth Amendment Due Process Clause, the Fourteenth Amendment Equal Protection Clause and Muir's right to privacy. 5) Whether the decision to exclude an alternative

AIT threat alarm resolution policy for passengers experiencing a medical emergency and unable to comply with the required physical "pat-down" to resolve AIT threat alarms in its SOP violates 29 U.S.C. § 794, the Fourth Amendment prohibition on unreasonable searches, the Fifth Amendment Due Process Clause, and the Fourteenth Amendment Equal Protection Clause. 6) Whether the TSA decision to not include the requirement for a warning to passengers that there is no alternative AIT threat alarm resolution policy for passengers experiencing a medical emergency and unable to comply with the required physical "pat-down" to resolve AIT threat alarms in its SOP violates the Fourth Amendment prohibition on unreasonable search and seizure, the Fifth Amendment Due Process Clause and the Fourteenth Amendment Equal Protection Clause. 7) Whether the TSA decision to not include the requirement for a warning to passengers that a passenger's hidden physical disorders could be revealed, through no fault of his own, during the checkpoint screening process in its SOP violates 29 U.S.C. § 794, the Fourth Amendment prohibition on unreasonable searches, the Fifth Amendment Due Process Clause and the Fourteenth Amendment Equal Protection Clause. 8) Whether the TSA decision to not include the requirement for a warning to passengers that a passenger's reasonable expectation of privacy could be violated due to advanced imaging technology used during the search process violates the Fourth Amendment prohibition on unreasonable search and seizure, the Fifth Amendment Due Process Clause and the Fourteenth Amendment Equal Protection Clause.

**STATE ACTION: PEORIA COUNTY - PRONG 2.** The District Court erred in failing to construe state action from Muir's pleadings. "To state a claim for relief under 42 U.S.C. § 1983, a plaintiff must allege that he or she was deprived of a right secured by the Constitution or the laws of the United States, and that this deprivation occurred at the hands of a person or persons acting under the color of state law." *Buchanan-Moore v. Cty. of Milwaukee,* 570 F.3d

824, 827 (7th Cir.2009). *DS v. East Porter County School Corp.*, 799 F. 3d 793, 798 (7th Cir. 2015). The Court erred because Muir implicitly complained of Peoria County, a widely-accepted state actor enforcing federal law at the TSA airport Checkpoint, explicitly alleged a deprivation of his constitutional rights, and explicitly alleged state action in his motion practice.

On August 12, 2018, Peoria County acted under color of law, and by wielding its sole power to arrest Muir at the TSA airport security checkpoint, committed tortious misconduct through a failure to train and supervise its officers with regards to federal law and the U.S. Constitution, and this deliberately indifferent, negligent and reckless conduct led directly to a deprivation of Muir's constitutional right to privacy and Muir's well-established rights under U.S. Constitution Amendments IV, V, and XIV and this occurred due to official county policy, and the county's failure to train and supervise was a proximate cause and moving force behind Muir's injuries because Peoria County has the monopoly on the use of force and the threat of arrest is the key factor in Muir being unconscionably coerced into acting against his will and against his own best interest in order to secure his lawful release from TSA control (Appx. 41).

### Tortious Misconduct: A Failure to Train and Supervise

"Plaintiff does not explain how Defendant Allegiant Air should have been aware TSA might engage in tortious misconduct during the screening process. And the Court is aware of no aspect of law which imposes a duty to warn of unpredictable wrongdoing at the hands of a third party." (Appx. 20). The wrongdoing of L3's proprietary ATR software and the resulting unconstitutional and tortious false imprisonment it instigated were anything but unpredictable and all defendants were aware that TSA might engage in tortious misconduct because false ATR threat alarms were frequent and were known to lead to invasive, unnecessary pat-downs and

25

Muir's injuries were legally foreseeable because Defendant L3 sought protection from tort liability through its Safety Act application and DHS held a widely-publicized public contest to fix Defendant L3's proprietary algorithm because it had a known, quantifiable and unreasonably high false threat alarm rate (Appx. 48). All defendants knew that all air passengers must be screened and privacy concerns were well known to all parties and had been litigated in *EPIC*. Passengers with disabilities are a protected, clearly identified group facing difficulties in transportation, are known to travel by air and therefore all defendants knew or should have known that all elements of the TSA checkpoint must conform to all requirements of federal law, including 49 U.S. C. § 40103(a)(2), 49 U.S.C. § 44901(l)(1)(A)(i), 29 U.S.C. § 794, the Americans with Disabilities Act, the Air Carrier Access Act and the United States Constitution.

"In *Monell* and subsequent cases, we have required a plaintiff seeking to impose liability on a municipality under § 1983 to identify a municipal "policy" or "custom" that caused the plaintiff's injury. See *Monell, supra,* at 694; *Pembaur, supra,* at 480-481; *Canton, supra,* at 389. The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the "moving force" behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Board of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403-404 (1997). "[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Canton v. Harris*, 489 U.S. 378, 388-389 (1989).

Peoria County is a municipal policymaker and the municipal policy or custom that directly led to the deprivation of Muir's federal rights in a federal facility of interstate commerce

is Peoria County's failure to train on 29 U.S.C. § 794 as part of a federal program. Individuals with disabilities are a recognized and protected class of travelers with whom Peoria County comes into contact on a predictable and regular basis at PIA and the deprivation of the rights of protected individuals such as Muir was a plainly obvious consequence of the decision to ignore training on the specific laws that protect them, such as Section 504 of the Rehabilitation Act of 1973, the ADA, Department of Transportation and Department of Homeland Security rules with regards to travelers with disabilities, and the constitutional right to privacy, especially with regards to private health information, and this decision to deliberately ignore binding law was the moving force behind Muir's coercion and injuries, which could not have occurred without Peoria County acting under color of law while enforcing federal law at the TSA airport checkpoint.

Muir obtained evidence of Peoria County's tortious misconduct after his complaint had been filed and completely by happenstance. In an attempt to coordinate his future air travel activity with local law enforcement on duty at the TSA checkpoint at PIA, Muir reported his situation to a Peoria County Sheriff's deputy. While he initially went to the Peoria Sheriff's Department to complain of and seek protection from TSA and L3's ATR software during the airplane boarding process, Muir learned: 1) the deputy he made his report to, who confirmed he had worked at PIA in an official capacity, did not know the law with regards to Muir's rights as a traveler with a disability, 2) there was no official policy in place for protecting Muir's rights during the security screening process, and 3) that Muir was certain to be arrested if he failed to obey TSA personnel for any reason, including for his own physical safety needs due to an uncontrollable symptom manifestation of his congenital disability. The deputy Muir spoke with asked Muir if he had a doctor's note giving him permission to travel. This is a violation of federal law as Muir does not need anybody's permission to exercise his right to travel between

the several states by air because during a medical emergency Muir requires no extraordinary care and is a danger only to himself. The deputy also told Muir that nobody would believe him about his disability (Muir's August 2018 scans notwithstanding). He said this in front of Muir's wife, who has witnessed Muir's years of disability-related pain in such a personal way that the deputy's statement is not only absurd, but shows exactly the deliberate indifference and complete ignorance regarding Muir's legal rights that made this civil action necessary in the first place.

**Official Policy: A Proximate Cause and Moving Force**

While it is clear that the federal courts should not be in the business of second-guessing municipal employee-training programs, the federal courts must scrutinize municipal employee-training programs which also exist as part of a federal program, especially one with such an awesome and powerful technological reach as the TSA airport checkpoint scheme. "Where a plaintiff claims that a particular municipal action *itself* violates federal law, or directs an employee to do so, resolving these issues of fault and causation is straight forward. Section 1983 itself "contains no state-of-mind requirement independent of that necessary to state a violation" of the underlying federal right. *Daniels* v. *Williams,* 474 U. S. 327, 330 (1986). In any § 1983 suit... the conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains." *Board of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 404-405 (1997). Peoria County must know and follow all federal laws in its state-actor role in the airport checkpoint scheme and Peoria County official municipal policy of both broadly ignoring and failing to train on 29 U.S.C. § 794 violates federal law and was therefore the moving force behind Muir's injuries because, while having the monopoly on the use of force at the TSA Checkpoint, Peoria County denied Muir the protections found in

Section 504. Official county policy is to detain people based solely on TSA personnel directives, which themselves are, in the case of an advanced imaging technology scan threat alarm, based on what a proprietary, unmonitored, unreviewable and error-prone artificial intelligence determines, regardless of the traveler's disability status, current health status and constitutional rights. Deliberate indifference to travelers with disabilities under Section 504 at a facility of interstate commerce is negligent, reckless, unlawful, and unconstitutional and Muir was a foreseeable victim of the County's tortious acts as interacting with travelers with disabilities is a statistical certainty at PIA and threats of harm to travelers with disabilities were familiar and specific as the ridiculously high false threat alarm rate of L3's ATR software was well known. Peoria County official policy violated Muir's constitutional rights and federal law and was therefore, under *Board of Comm'rs of Bryan Cty. v. Brown*, the proximate cause of Muir's injuries.

## CONCLUSION

Dismissal is in error because Muir has pleaded facts that set forth a plausible claim upon which relief can be granted. The District Court's January 22, 2021 order (Doc. 46) should be reversed, Muir's action should be remanded so it can be heard on its merits under § 1983, and this Court of Appeals should grant Muir leave to amend his pleadings to: 1) explicitly name state actor Peoria County as a defendant in the caption, 2) allege negligence and false imprisonment tort claims against Defendant Peoria County, 3) explicitly allege a Fourteenth Amendment Equal Protection Clause claim, 4) state a cause of action under 42 U.S.C. § 1983, 5) allege a § 1983 conspiracy against all defendants, and 6) allege a failure to train against Defendant United States.

Muir prays this Court of Appeals will also grant him the following relief: 1) Injunction requiring the return of Muir's August 9 and August 12, 2018 passenger screening data image

scans to him, 2) Injunction requiring the return of Muir's June 6 and June 9, 2019 passenger screening data image scans to him, 3) Permanent injunctive relief prohibiting Defendants from impermissibly singling-out and discriminating against Muir because of his congenital disorder, and 4) Permanent injunctive relief prohibiting Defendants from denying Muir his statutory right to travel between the several states by air.

Finally, Muir salutes this Court of Appeals for considering his foregoing arguments as advanced imaging and artificial intelligence are some of the most pressing and serious issues of our times. Humanity must retain its capacity for empathy if we are to have any real chance at a high technology future under an all-knowing state that includes the precious life, sacred liberty and glorious pursuit of happiness as so envisioned and originally pledged to us by our Founders.

## CERTIFICATE OF COMPLIANCE

This document complies with the typeface and type-style requirements of Fed. R. App. P. Circuit Rule 32(b) because this document has been prepared using Microsoft Word 2010 in 12-point Times New Roman. This document complies with the type-volume limit of Fed. R. App. P. Circuit Rule 32(c) because this document contains 10,789 words.

DATED: this 15th day of April, 2021

Respectfully submitted,

MICHAEL GIBSON MUIR

MICHAEL GIBSON MUIR
19 Inglewood Lane
Bloomington, IL 61704
(712) 309-6121

# APPENDIX

## APPENDIX TABLE OF CONTENTS

Page

Doc. 46: Order and Opinion Case No. 1:20-cv-01280 .............................................................. A-1

Doc. 12: Page 7 of Muir's First Amended Complaint ............................................................. A-41

Doc. 36: Page 29 of Muir's Response to Defendant Allegiant Air .......................................... A-42

Doc. 38: Page 15 of Muir's Response to Defendant Federal Defendants ................................ A-43

Doc. 34: Page 8 of Defendant Pekoske's Motion to Dismiss .................................................. A-44

Doc. 49: Page 1 of Short Record of Appeal Case No. 1:20-cv-01280 .................................... A-45

Apex Screening at Speed, Slide 3, John Fortune, DHS S&T, May 10, 2016 ........................... A-46

Doc. 43-1: Page 2 of the Declaration of George Salimbas ...................................................... A-47

Passenger Screening Algorithm Challenge, Slide 3, Dr. John Fortune, DHS S&T ................. A-48

DHS OIG-20-33, Page 3, May 8, 2020 ................................................................................... A-49

Doc. 22: Page 11 of Case No. 2:19-cv-05887-DGC ............................................................... A-50

**49 U.S.C. § 46110 Petition for Review of a Final TSA Order Docs. (Appx. A-46 thru A-50):**
A-46: May 10, 2016 presentation at Northeastern University demonstrates that DHS and TSA knew that AIT false threat alarms were frequent and that AIT scans did not discriminate between different materials (i.e. natural human tissue vs. a foreign object). A-47: Paragraph 18 shows that Defendant L3 was not monitoring its proprietary ATR software while it was in use at the TSA Checkpoint. A-48: Demonstrates that taxpayer funds were used to help the private sector solve known problems with proprietary screening technology. A-49: Demonstrates that Defendant L3's proprietary ATR software was not being monitored by DHS or TSA. A-50: Demonstrates that Defendant L3 believed Muir did not have the constitutional right to the reasonable expectation of privacy beneath his skin during the checkpoint security screening process.

**CIRCUIT RULE 30 STATEMENT:** I hereby certify that all of the materials required by parts (a) and (b) of this rule are included.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | | |
|---|---|---|
| MICHAEL GIBSON MUIR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:20-cv-01280 |
| | ) | |
| UNITED STATES TRANSPORTATION | ) | |
| SECURITY ADMINISTRATION; DAVID | ) | |
| P. PEKOSKE, *in his individual capacity*; | ) | |
| L3HARRIS TECHNOLOGIES, INC.; | ) | |
| ALLEGIANT AIR, LLC; CHAD F. WOLF, | ) | |
| *in his official capacity as United States* | ) | |
| *Department of Homeland Security*; | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER AND OPINION

This Matter is before the Court on multiple motions to dismiss. Defendant Allegiant Air, LLC, has filed a Motion for Judgment on the Pleadings Pursuant to Rule 12(c) and Motion to Dismiss for Failure to State a Claim Pursuant to Rule 12(b)(6). (Docs. 30, 31). Defendants United States Transportation Security Administration (TSA), David P. Pekoske, and Chad. F. Wolf (collectively, "Federal Defendants") have filed a joint Motion to Dismiss (doc. 33); Defendant David P. Pekoske has also filed, in his individual capacity, a separate Motion to Dismiss for Failure to State a Claim (doc. 34). And Defendant L3Harris Technologies, Inc. (L3), has filed a Motion to Dismiss. (Doc. 37). All motions have been fully briefed and are therefore ripe for review.

1:20-cv-01280-JBM-JEH    # 46    Page 2 of 40

## BACKGROUND[1]

Plaintiff claims he was psychologically and physically injured as a result of two encounters with Defendant TSA. (Doc. 12). On August 9, 2018, Defendant presented at the Phoenix-Mesa Gateway Airport in Mesa, Arizona, for mandatory pre-flight screening. (Doc. 12 at 5). While Plaintiff was in the "hands-up" position during the body scan portion of the screening, his hernia at his right groin became symptomatic; TSA officials informed Plaintiff that the body scan revealed an anomaly at Plaintiff's right groin, necessitating a pat-down search. (Doc. 12 at 5–7). Plaintiff ordered the TSA officials not to touch his right groin because he was experiencing a serious medical emergency and "being touched at his right groin would result in extreme physical pain and could endanger his life." (Doc. 12 at 7). The TSA officials persisted, and Plaintiff—against his will—submitted to the pat-down search. (Doc. 12 at 7).

On August 12, 2018, Plaintiff presented at the Peoria International Airport in Peoria, Illinois, for mandatory pre-flight screening. (Doc. 12 at 8). Plaintiff's hernia again became symptomatic during the body scan, and TSA officials again required a physical pat-down of Plaintiff's right groin. (Doc. 12 at 8–11). Plaintiff again ordered the TSA officials not to touch his right groin because he was experiencing a serious medical emergency and physical contact "would result in immediate and extreme physical pain." (Doc. 12 at 10). He offered to instead lower his pants and underwear to show the TSA officials his hernia; the TSA officials declined and required the pat-

---

[1] The facts in this section are derived from the First Amended Complaint and are taken as true in resolving the instant motions.

down search. Plaintiff again reluctantly submitted to the pat down, desperate to end the interaction. (Doc. 12 at 11). As a result of these two incidents, Plaintiff suffers "severe ongoing psychological distress and disturbing physical manifestations." (Doc. 12 at 11).

## LEGAL STANDARDS

The various motions for dismissal invoke multiple legal standards.

A.   *Federal Rules of Civil Procedure 12(b)(6) and 12(c) – Failure to State a Claim and Judgment on the Pleadings*

"A motion for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure is governed by the same standards as a motion to dismiss for failure to state a claim under Rule 12(b)(6)." *BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015) (quoting *Adams v. City of Indianapolis*, 742 F.3d 720, 727–28 (7th Cir. 2014)). To survive dismissal pursuant to Rule 12(b)(6), the complaint must contain a short and plain statement of the plaintiff's claim sufficient to plausibly demonstrate entitlement to relief. Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–57 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A plaintiff is not required to anticipate defenses or plead extensive facts or legal theories; rather, the complaint need only contain enough facts to present a story that holds together. *Twombly*, 550 U.S. at 570; *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010). The Seventh Circuit has consistently noted the essential function of Rule 8(a)(2) is to put the defendant on notice. *Divane v. Nw. Univ.*, 953 F.3d 980,

1:20-cv-01280-JBM-JEH  # 46    Page 4 of 40

987 (7th Cir. 2020) ("A complaint must give the defendant fair notice of what . . . the claim is and the grounds upon which it rests." (internal quotation marks omitted)).

On review of a Rule 12(b)(6) motion, the Court construes the complaint in the light most favorable to the plaintiff. *United States ex rel. Berkowitz v. Automation Aids, Inc.*, 896 F.3d 834, 839 (7th Cir. 2018). This means the Courts accepts all well-pleaded factual allegations as true and draws all reasonable inferences from those facts in favor of the plaintiff. *Id.* Allegations that are, in reality, legal conclusions are not taken as true and cannot survive a Rule 12(b)(6) challenge. *McReynolds v. Merrill Lynch & Co., Inc.*, 694 F.3d 873, 885 (7th Cir. 2012). Moreover, *pro se* complaints must be construed liberally and held to a "less stringent standard than formal pleadings drafted by lawyers." *Perez v. Fenoglio*, 792 F.3d 768, 776 (7th Cir. 2015). (quoting *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011)).

B.    *Federal Rule of Civil Procedure 12(b)(1) – Subject Matter Jurisdiction*

"Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree." *United States v. Alkaramla*, 872 F.3d 532, 534 (7th Cir. 2017) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). Whether a case falls within the limited jurisdiction of the federal courts is both a constitutional and a statutory question. "[T]he Constitution imposes a ceiling, albeit a high one, on the potential jurisdiction of the federal courts" by "permit[ting] federal courts to hear only certain claims." *Int'l Union of Operating Eng'rs, Loc. 150, AFL-CIO v. Ward*, 563 F.3d 276, 280–81 (7th Cir. 2009); *see also* U.S. Const. art. III, § 2, cl. 1. Congress has the authority "to further refine the actual scope of federal jurisdiction" because federal

4

1:20-cv-01280-JBM-JEH  # 46    Page 5 of 40

jurisdiction must be exercised pursuant to a statutory grant. *Id*. Thus both the Constitution and federal statutory law "must authorize a federal court to hear a given type of case" for federal jurisdiction to lie. *Id.* at 280.

There are two types of jurisdictional challenges: facial and factual. "Facial challenges require only that the court look to the complaint and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction." *Apex Digit., Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009) (emphasis omitted). "In reviewing a facial challenge, the court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the plaintiff." *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015). "In contrast, a factual challenge lies where the complaint is formally sufficient but the contention is that there is in fact no subject matter jurisdiction." *Apex Digit.*, 572 F.3d at 444 (internal quotation marks omitted). In such cases, "[t]he district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Id*. In any event, the plaintiff "bears the burden of establishing that the jurisdictional requirements have been met." *Ctr. for Dermatology & Skin Cancer, Ltd. v. Burwell*, 770 F.3d 586. 588–89 (7th Cir. 2014).

DISCUSSION

The Court will address each motion to dismiss in turn.

## I. Defendant Allegiant Air's Motion to Dismiss

Defendant Allegiant Air argues Plaintiff's allegations against it, set forth in Counts XV–XX of the First Amended Complaint (doc. 12 at 20–24), are time-barred

and fail to state a claim. (Doc. 31 at 5). Plaintiff's Response argues (1) his claims survive scrutiny under Rule 12(b)(6) and (2) the discovery rule—or, in the alternative, Defendant's fraudulent concealment of his claims—operated to toll the statute of limitations, rendering his claims timely. (Doc. 36 at 13–30). The Court granted Defendant Allegiant Air leave to file a Reply, which argued, *inter alia*, much of Plaintiff's Response should be disregarded as an impermissible attempt to amend the operative Complaint. (Doc. 41 at 2–3).

While it is indeed "axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss" *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984), it is likewise settled law that "facts alleged . . . in a brief in opposition to a motion to dismiss may be considered when evaluating the sufficiency of a complaint so long as they are consistent of the allegations in the complaint," *Smith v. Dart*, 803 F.3d 304, 311 (7th Cir. 2015) (internal quotation marks omitted). Furthermore, "a complaint need not anticipate and overcome affirmative defenses, such as the statute of limitations." *Amin Ijbara Equity Corp. v. Vill. of Oak Lawn*, 860 F.3d 489, 492 (7th Cir. 2017) (internal quotation marks omitted). Rather, "dismissal at this early stage is appropriate when the complaint alleges facts sufficient to establish that the suit is indeed tardy." *Id.*; *see also Am. Family Mut. Ins. Co. v. Krop*, 2018 IL 122556, ¶ 21, 120 N.E.3d 982, 988, *reh'g denied* (Nov. 26, 2018) ("When a complainant should have discovered an injury is a question of fact, but this court can determine when the limitations period began if the facts are

6

A-6

undisputed and only one answer is reasonable.").[2] With these principles in mind, the

Court will consider "new" facts relating to the statute-of-limitations dispute that are

consistent with the allegations in the First Amended Complaint to determine

whether Plaintiff has "plead[ed] himself out of court," *see Cancer Found., Inc. v.*

*Cerberus Cap. Mgmt., LP*, 559 F.3d 671, 674–75 (7th Cir. 2009).

    A.    *Defendant Allegiant Air is Entitled to Judgment on the Pleadings with*
            *Respect to Counts XV–XVII Because They are Untimely*

      Plaintiff's claims against Defendant Allegiant Air sound in tort[3]—specifically,

personal injury—and the events giving rise to those claims occurred on August 9 and

12, 2018. (*See* doc. 12 at 5–11, 20–24). Illinois has a two-year statute of limitations

---

[2] "Under the familiar rule of *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938), we apply Illinois substantive law to resolve this question." *Hollander v. Brown*, 457 F.3d 688, 692 (7th Cir. 2006) (citing *Guaranty Trust v. York*, 326 U.S. 99, 110 (1945) (holding statutes of limitations are considered substantive rather than procedural matters for purposes of the *Erie* doctrine)).

[3] Though couched in terms of various constitutional rights to privacy, due process, and freedom from unreasonable searches, Counts XV–XX sound in tort. Counts XV and XVIII allege negligence (doc. 12 at 21, 22), Counts XVI and XIX allege negligent infliction of emotional distress (NIED) (doc. 12 at 21, 23), and Counts XVII and XX allege intentional infliction of emotional distress (IIED) (doc. 12 at 22, 24). It appears Plaintiff claims Defendant Allegiant Air committing the alleged torts by infringing various constitutional rights. While a claim could conceivably sound in both tort and constitutional law, "[m]ost rights secured by the Constitution are protected only against infringement by governments, so . . . the conduct allegedly causing the deprivation of a federal right [must] be fairly attributable to the State." *Listecki v. Official Comm. of Unsecured Creditors*, 780 F.3d 731, 741 (7th Cir. 2015) (internal quotation marks omitted). Both the First Amended Complaint and Plaintiff's Response fail to explain how the actions of Defendant Allegiant Air, a private corporation, may be fairly attributable to a state government or to the federal government. Rather, Plaintiff's Response only discusses tort. The Court will therefore treat Plaintiff's claims as tort claims, not constitutional claims.

for personal injury claims. *See* 735 ILCS 5/13-202.[4] Yet, Defendant Allegiant Air was not named in this lawsuit until Plaintiff filed his First Amended Complaint on September 4, 2020, more than two years after the August 2018 events giving rise to Plaintiff's claims and therefore outside the limitations period.

### 1. Neither the Discovery Rule nor the Illinois Fraudulent Concealment Defense Toll the Statute of Limitations

Plaintiff first argues the limitations clock was tolled by operation of the discovery rule. (Doc. 36 at 13–15). According to Plaintiff, he did not discover he was injured "until the sudden and severe onset of symptoms of post-traumatic stress, including painful involuntary movements, panic attacks, paranoia and severe emotional distress brought on by the unwanted and unwelcome entry of the menacing presence [he] can only describe as the Shadow into his psyche in August 2019." (Doc. 36 at 13). He therefore argues the limitations period does not expire until sometime in August 2021. (Doc. 36 at 14). He also argues his duty to inquire whether he had a legal cause of action could have begun on June 6, 2019, when he had an encounter with TSA that did not result in a pat-down search. (Doc. 36 at 14–15). In support of

---

[4] As some events giving rise to Plaintiff's claims against Defendant Allegiant Air occurred in Arizona, there is a potential choice-of-law issue. However, neither party has identified a relevant conflict of laws—indeed, both Illinois and Arizona have a two-year statute of limitations for personal injury claims, Ariz. Rev. Stat. Ann. § 12-542—so the Court will apply the substantive law of Illinois where appropriate. *McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 684 (7th Cir. 2014) ("Federal courts hearing state law claims under diversity or supplemental jurisdiction apply the forum state's choice of law rules to select the applicable state substantive law."); *J.S.T. Corp. v. Foxconn Interconnect Tech. Ltd.*, 965 F.3d 571, 577 n.1 (7th Cir. 2020) ("[W]hen neither party raises a conflict of law issue in a diversity case, a federal court should apply the law of the state in which it sits.").

his argument, Plaintiff cites *Knox Coll. v. Celotex Corp.*, 88 Ill. 2d 407, 415, 430

N.E.2d 976, 980 (1981).

In *Knox. Coll.*, the Illinois Supreme Court explained the discovery rule as

follows:

> The statute starts to run when a person knows or reasonably should
> know of his injury and also knows or reasonably should know that it was
> wrongfully caused. At that point the burden is upon the injured person
> to inquire further as to the existence of a cause of action.

*Id.* at 416 (quoting *Witherell v. Weimer*, 85 Ill. 2d 146, 156, 421 N.E.2d 869, 874

(1981)). In making this determination, the court must first consider whether the

alleged injury was the result of a "sudden, traumatic event," or became apparent only

after a "late or 'insidious' onset." *Hollander v. Brown*, 457 F.3d 688, 692 (7th Cir.

2006). "[A] 'sudden, traumatic event' is one that, because of its force or violence,

permits the law to presume that the event immediately placed the plaintiff on notice

of her injury and a right of action." *Id.* "In insidious onset cases, by contrast, the

nature of the event does not permit the plaintiff to learn of her injury, or of the causal

link between the defendant's conduct and her injury, until some time after the event."

*Id.* Examples of insidious onset or latent injuries include those resulting from medical

malpractice or exposure to toxic products such as asbestos. *Golla v. Gen. Motors

Corp.*, 167 Ill. 2d 353, 366, 657 N.E.2d 894, 900 (1995).

"[W]here the plaintiff's injuries are caused by a sudden traumatic event, the

plaintiff's cause of action accrues when the injury occurred." *Golla*, 167 Ill. 2d at 361.

This is because "the nature and circumstances surrounding a traumatic event puts

an injured party on notice that actionable conduct might be involved," *id.* at 363, thus

triggering the plaintiff's duty to investigate. Moreover, a plaintiff's "alleged failure to fully discover the nature of his injuries" is insufficient to toll the limitations clock, for "[t]here is no requirement that a plaintiff must know the full extent of his or her injuries before suit must be brought under the applicable statute of limitations." *Doe v. Hastert*, 2019 IL App (2d) 180250, ¶ 34, *appeal denied*, 135 N.E.3d 558 (Ill. 2019) (internal quotation marks omitted). Conversely, in cases involving insidious onset or latent injuries, the discovery rule tolls "the running of the limitations period until the plaintiff either knew or reasonably should have known that he was injured and that the injury was wrongfully caused." *Golla*, 167 Ill. 2d at 366.

In *Hastert*, the plaintiff filed a lawsuit alleging battery, false imprisonment, NIED, and IIED based on a sexual assault which occurred while the plaintiff was a minor; however, the plaintiff did not file suit until more than 30 years after the claim accrued.[5] 2019 IL App (2d) 180250, ¶¶ 11, 13. The defendant moved for dismissal, arguing the claims were time-barred; the plaintiff argued, *inter alia*, he did not fully realize "his injuries and their relation to [defendant's] sexual assault on him as a child" until much later. *Id.* ¶ 23. The Illinois Appellate Court rejected the plaintiff's argument, concluding the plaintiff was aware of the abuse as it happened and his failure to realize the extent of his injuries within the limitations period was insufficient to toll the clock. *Id.* ¶¶ 33, 34; *see also Parks v. Kownacki*, 193 Ill. 2d 164,

---

[5] The same two-year statute of limitations applicable here also applied in *Hastert*. 2019 IL App (2d) 180250, ¶ 28. But because the plaintiff was a minor when the actionable conduct occurred, his claims did not accrue until his eighteenth birthday, meaning the statute of limitations expired two years thereafter. *See* 735 ILCS 5/13-211(a).

178, 737 N.E.2d 287, 295 (2000) ("Because . . . plaintiff was aware of both the cause and some injury, we hold that plaintiff's failure to understand the connection between the abuse and other injuries does not toll the statute of limitations."); *Clay v. Kuhl*, 189 Ill. 2d 603, 611, 727 N.E.2d 217, 222 (2000) ("We do not believe that the plaintiff's alleged failure to fully discover the nature of her injuries is sufficient to delay the running of the limitations period."); *Golla*, 167 Ill. 2d at 364 ("[O]ur cases adhere to the general rule that the limitations period commences when the plaintiff is injured, rather than when the plaintiff realizes the consequences of the injury or the full extent of her injuries.").

By arguing he was unaware the August 2018 incidents were abnormal until he had a noneventful interaction with TSA in June 2019, Plaintiff seems to assert his injuries fall into the category of cases involving insidious onset or latent injuries. The Court disagrees. Plaintiff's First Amended Complaint and Response describe two discrete, distressing events. Similar to *Hastert*, *Parks*, *Golla*, and *Clay*, there is no doubt Plaintiff was aware of the alleged misconduct when it occurred, and his allegations demonstrate he believed he was injured at that time.[6] Plaintiff alleges he experienced immediate physical pain during the pat downs and felt humiliated and desperate to escape the TSA checkpoints on both occasions (docs. 36 at 4; 12 at 6–11). Additionally, Plaintiff warned the TSA agents he would experience such pain if

---

[6] Though Plaintiff may arguably not have believed the alleged misconduct actionable at the time, "[t]he limitations period begins running even if the plaintiff does not know that the misconduct was actionable." *Parks*, 193 Ill. 2d at 176 (citing *Knox College*, 88 Ill. 2d at 415).

patted down on August 12, 2018; the fact that this warning followed a nearly identical scenario on August 8 suggests Plaintiff felt pain during the August 8 pat down. That Plaintiff did not realize the full extent of his psychological injuries until the onset of symptoms in August 2019 does not mean he did not know he was injured in August 2018.

The Court concludes this case falls in the sudden, traumatic event category. A reasonable person experiencing the type of trauma and injuries described by Plaintiff would be on notice "that actionable conduct might be involved" at the time the traumatic event occurred. See *Golla*, 167 Ill. 2d at 363. As Plaintiff was clearly aware of both the cause and some extent of his alleged injuries in August 2018, the Court sees no basis to stray from the Illinois Supreme Court's holdings in *Golla*, *Parks*, and *Clay*. Plaintiff's discovery rule argument fails.

Plaintiff next argues fraudulent concealment is a "relevant factor."[7] "If a person liable to an action fraudulently conceals the cause of such action from the knowledge of the person entitled thereto, the action may be commenced at any time within 5 years after the person entitled to bring the same discovers that he or she has such cause of action, and not afterwards." 735 ILCS 5/13-215. However, where the

---

[7] The Court presumes Plaintiff is arguing fraudulent concealment as a defense to the two-year statute of limitations. "Fraudulent concealment, as codified in section 13-215, is not a cause of action in and of itself; rather, it acts as an exception to the time limitations imposed on other, underlying causes of action." *Wisniewski v. Diocese of Belleville*, 406 Ill. App. 3d 1119, 1154, 943 N.E.2d 43, 72–73 (2011). At any rate, the First Amended Complaint does not allege an affirmative claim for fraudulent concealment against Defendant Allegiant Airlines, and Plaintiff may not use his Response to assert new claims. *Car Carriers*, 745 F.2d at 1107.

alleged injury is the result of a sudden, traumatic event, section 13-215 does not toll the statute of limitations because the injured party is on notice of his or her right to sue at the time of injury. *Lowe v. Ford Motor Co.*, 313 Ill. App. 3d 418, 422, 730 N.E.2d 58, 61 (2000). Because Plaintiff's alleged injuries were the result of sudden, traumatic events, he cannot invoke section 13-215 to toll the statute of limitations. Indeed, Illinois "courts have been clear that section 13-215 is applicable only where the concealment of a cause of action consisted of affirmative acts or representations *that prevent the discovery of the cause of action.*" *Id.* (emphasis in original). The Court has concluded Plaintiff should have been aware of his injuries and their wrongful cause at the time he was injured in August 2018; any finding Defendant Allegiant Air thereafter prevented discovery of Plaintiff's claims would be a logical impossibility.

### 2. The First Amended Complaint Partially Relates Back to the Original Complaint

Defendant Allegiant Air argues the amendments in the First Amended Complaint adding it as a defendant and the several claims against it do not relate back to the original Complaint, which was filed on July 31, 2020, within the applicable two-year limitations period. (Doc. 31 at 7–8). Alternatively, Defendant Allegiant Air argues only the claims based on the August 12 screening can relate back because the August 9 screening, a wholly separate incident, was not detailed in the original Complaint. (Doc. 31 at 9 n.5). Curiously, Plaintiff declined to respond to Defendant Allegiant Air's arguments, maintaining the argument was premature and misplaced. (Doc. 36 at 16).

13

A-13

Pursuant to Federal Rule of Civil Procedure 15(c)(1)(C):

> An amendment to a pleading relates back to the date of the original pleading when . . . the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by [Federal Rule of Civil Procedure] 4(m) for serving the summons and complaint, the party to be brought in by amendment . . . (i) received such notice of the action that it will not be prejudiced in defending on the merits; and (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

*See also Joseph v. Elan Motorsports Techs. Racing Corp.*, 638 F.3d 555, 559–60 (7th Cir. 2011). Rule 15(c)(1)(B) requires the proposed amendment to assert "a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." And Rule 4(m) sets a 90-day deadline for service of process.

The Seventh Circuit has yet to decide whether Rule 15(c)(1)(C) or its Illinois counterpart, 735 ILCS 5/2-616(d), applies when a district court in Illinois is sitting in diversity or exercising supplemental jurisdiction. Nevertheless, both the Seventh Circuit and Illinois courts have indicated the two rules are essentially identical, and Illinois courts look to federal jurisprudence on Rule 15(c)(1)(C) for persuasive authority. *Springman v. AIG Mktg., Inc.*, 523 F.3d 685, 688 (7th Cir. 2008); *Borchers v. Franciscan Tertiary Province of Sacred Heart, Inc.*, 2011 IL App (2d) 101257, ¶¶ 42–45, 962 N.E.2d 29, 44–46; *Walstad v. Klink*, 2018 IL App (1st) 170070, ¶ 19, 105 N.E.3d 1016, 1022.

Plaintiff's claims against Defendant Allegiant Air can be separated into two sets: one set of claims (negligence, NIED, and IIED) for each TSA encounter at issue. The original Complaint only detailed the August 12 encounter with TSA in Illinois;

it did not allege any facts pertaining to the August 9 encounter in Arizona. (*See* doc. 1 at 4–7). Though the two encounters with TSA were similar and resulted in similar injuries, they were two separate encounters on separate days in different states and presumably involving different TSA agents; they therefore cannot be characterized as the same transaction or occurrence. *See Mayle v. Felix*, 545 U.S. 644, 659 (2005). Consequently, Rule 15(c)(1)(B) is only satisfied with respect to the set of claims based on the August 12 encounter in Illinois (Counts XVIII–XX). The set of claims based on the August 9 in Arizona encounter (Counts XV–XVII) cannot relate back to the original Complaint, and Defendant Allegiant Air is therefore entitled to judgment on the pleadings with respect to those claims.

As for the set of claims based on the August 12 encounter, the operative questions thus become (1) whether Defendant Allegiant Air knew or should have known within the period provided by Rule 4(m) for serving the summons and complaint that the claims "would have been brought against it, but for a mistake concerning the proper party's identity" and (2) whether it would be prejudiced by defending the claims on the merits. Rule 15(c)(1)(C); *Joseph*, 638 F.3d at 559–60 (noting the proper emphasis is on the defendant's knowledge of the plaintiff's intent to sue it, not the plaintiff's carelessness or mistake in naming the proper defendant).[8]

---

[8] Inexplicably, Defendant Allegiant Air urges the Court to determine the amendments do not relate back because Plaintiff made a deliberate choice not to sue it within the limitations period, citing *Krupski v. Costa Crociere S. p. A.*, 560 U.S. 538, 549 (2010) ("We agree that making a deliberate choice to sue one party instead of another while fully understanding the factual and legal differences between the two parties is the antithesis of making a mistake concerning the proper party's

15

Respecting the first question, the 90-day period under Rule 4(m) began after Plaintiff

filed the original Complaint on July 31, 2020. Defendant Allegiant Air attained actual

knowledge of Plaintiff's intent to sue it no later than the date on which it was served

with the First Amended Complaint: September 14, 2020, forty-five days after the

Complaint was filed. (*See* doc. 14). Defendant Allegiant Air thus had adequate notice

of Plaintiff's claims against it within the requisite 90-day timeframe. And Defendant

Allegiant Air makes no argument as to the second question, likely because it cannot

reasonably claim prejudice here; the instant Motion also challenges the substance of

Plaintiff's claims, demonstrating Defendant Allegiant Air can clearly defend this

lawsuit on the merits. The Court therefore finds the set of claims based on the August

12 encounter, Counts XVIII–XX of the First Amended Complaint, relate back to the

---

identity."), and *Hall v. Norfolk Southern Ry. Co.*, 469 F.3d 590, 596 (7th Cir. 2006).
(Doc. 31 at 7–8). The Court, however, went on to flatly reject Defendant Allegiant
Air's very argument in *Krupski* in no uncertain terms:

> We disagree, however, with respondent's position that any time a
> plaintiff is aware of the existence of two parties and chooses to sue the
> wrong one, the proper defendant could reasonably believe that the
> plaintiff made no mistake. The reasonableness of the mistake is not
> itself at issue. As noted, a plaintiff might know that the prospective
> defendant exists but nonetheless harbor a misunderstanding about his
> status or role in the events giving rise to the claim at issue, and she may
> mistakenly choose to sue a different defendant based on that
> misimpression. *That kind of deliberate but mistaken choice does not
> foreclose a finding that Rule 15(c)(1)(C)(ii) has been satisfied.*

*Id.* (emphasis added). Further, the Seventh Circuit has expressly recognized *Hall* is
no longer controlling precedent after of *Krupski*. *Joseph*, 638 F.3d at 559 ("[T]he
Supreme Court in *Krupski* . . . changed what we and other courts had understood[ ]
in *Hall*[.]"). Counsel for Defendant Allegiant Air are reminded of their obligations
under Federal Rule of Civil Procedure 11. The Court will not tolerate deliberate
attempts to mislead.

original Complaint, which was timely under the applicable two-year statute of limitations.

B.    *Plaintiff Failed to State a Claim Against Defendant Allegiant Air*

In the surviving counts, Plaintiff alleges Defendant Allegiant Air committed negligence, NIED, and IIED. Defendant Allegiant Air argues these claims fail as a matter of law. (Doc. 31 at 9–19).

### 1. Plaintiff Cannot Establish Negligence or NIED

In Illinois, a plaintiff alleging negligence must ultimately prove "existence of a duty, the defendant's breach of that duty, and that the breach proximately caused the plaintiff's resulting injuries." *Roh v. Starbucks Corp.*, 881 F.3d 969, 973 (7th Cir. 2018). Similarly, to establish NIED, a direct-victim plaintiff must ultimately prove the elements of negligence as well as "emotional distress and . . . a contemporaneous physical injury or impact." *Schweihs v. Chase Home Fin., LLC*, 2016 IL 120041, ¶ 31, 77 N.E.3d 50, 58 (quoting *Corgan v. Muehling*, 143 Ill. 2d 296, 303, 574 N.E.2d 602, 605 (1991)).

Plaintiff's negligence and NIED claims in Counts XVIII and XIX are premised on the notion that Defendant Allegiant Air breached a duty to warn him about TSA's screening process, which resulted in physical and emotional damages. (*See* docs. 12 at 20–21; 36 at 18–27). Specifically, Plaintiff appears to argue he had a special relationship with Defendant Allegiant Air, which meant Defendant Allegiant Air had a duty to explain the TSA threat assessment procedures prior to his screening and warn him that the procedures may result in constitutional violations. (*See, e.g.*, doc. 36 at 22 ("Muir did not seek *assistance* during the threat assessment process but only

17

sought *fair notice of* the process so he could make the decision to avoid the process by electing not to fly." (emphasis in original))).

As a general matter, "[a] 'duty to warn exists where there is unequal knowledge, actual or constructive [of a dangerous condition], and the defendant[,] possessed of such knowledge, knows or should know that harm might or could occur if no warning is given.'" *Hutchison v. Fitzgerald Equip. Co., Inc.*, 910 F.3d 1016, 1022 (7th Cir. 2018) (quoting *Happel v. Wal-Mart Stores, Inc.*, 199 Ill. 2d 179, 186, 766 N.E.2d 1118, 1123 (2002)). And a heightened duty of care can be imposed where a special relationship exists between the parties. *See Iseberg v. Gross*, 227 Ill. 2d 78, 87, 879 N.E.2d 278, 284 (2007); Restatement (2d) of Torts §§ 314, 314A (1965).

> Historically, there have been four "special relationships" which this and other courts have recognized, namely, common carrier-passenger, innkeeper-guest, business invitor-invitee, and voluntary custodian-protectee. When one of these special relationships exists between the parties and an unreasonable risk of physical harm arises within the scope of that relationship, an obligation may be imposed on the one to exercise reasonable care to protect the other from such risk, if the risk is reasonably foreseeable, or to render first aid when it is known that such aid is needed. The existence of one of these four "special relationships" has typically been the basis for imposing an affirmative duty to act where one would not ordinarily exist.

*Iseberg*, 227 Ill. 2d at 88 (internal citations omitted); *see also* Restatement (2d) of Torts § 314A (1965). Comment e to § 314A clarifies the duty owed by a common carrier to a passenger:

> The duty in each case is only one to exercise reasonable care under the circumstances. The defendant is not liable where he neither knows nor should know of the unreasonable risk, or of the illness or injury. He is not required to take precautions against a sudden attack from a third person which he has no reason to anticipate, or to give aid to one whom

18

he has no reason to know to be ill. He is not required to take any action where the risk does not appear to be an unreasonable one[.]

Plaintiff's theory—that this heightened duty of care required Defendant Allegiant Air to warn him about or explain the TSA threat assessment procedures—fails for several reasons. First and foremost, not only is it common knowledge that airline passengers must undergo TSA screening prior to boarding a flight, *see e.g.*, *United States v. Hartwell*, 436 F.3d 174, 181 (3d Cir. 2006) ("It is inconceivable that Hartwell was unaware that he had to be searched before he could board a plane."), but it is required by federal law, 49 U.S.C. § 44901. American jurisprudence generally imposes knowledge of the law on all litigants. *Georgia v. Public.Resource.Org, Inc.*, ___ U.S. ___, 140 S. Ct. 1498, 1507 (2020) ("[E]very citizen is presumed to know the law."). Any claim Plaintiff was unaware of the requisite TSA screening runs counter to that principle.

Moreover, though Defendant Allegiant Air was under no duty to warn Plaintiff of a process required by law, it nevertheless did so in the Allegiant Contract of Carriage. (Doc. 31-1 at 3, 15).[9] Specifically, the Contract of Carriage stated: (1) "Passengers and their baggage are subject to inspection with an electronic detector with or without the passenger's consent or knowledge"; (2) Allegiant would not

---

[9] "[D]ocuments attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim." *Burke v. 401 N. Wabash Venture, LLC*, 714 F.3d 501, 505 (7th Cir. 2013) (internal quotation marks omitted and alteration in original). This rule applies to contracts central to a plaintiff's claim but not attached to the complaint. *Facebook, Inc. v. Teachbook.com LLC*, 819 F. Supp. 2d 764, 773 (N.D. Ill. 2011). The Court finds it may consider the Allegiant Contract of Carriage, which is incorporated into Plaintiff's airline ticket, without converting the instant Motion into one for summary judgment.

transport any "passenger who refuses to permit the search of his or her person or property for explosives or a concealed, deadly, or dangerous weapon or article"; and (3) "All transportation is sold and all carriage is performed subject to compliance with all applicable laws and governmental regulations, including those of the U.S. Department of Transportation and the Federal Aviation Administration, many of which are not specified herein but are nonetheless binding on Carrier and all passengers." (Doc. 31-1 at 3, 15).

To the extent Plaintiff argues Defendant Allegiant Air had a duty to warn him that TSA might engage in actionable misconduct during the screening process, he is incorrect. "[A common carrier] is not required to take precautions against a sudden attack from a third person which he has no reason to anticipate[.]" Restatement (2d) of Torts § 314A cmt. e (1965). Plaintiff does not explain how Defendant Allegiant Air should have been aware TSA might engage in tortious misconduct during the screening process. And the Court is aware of no aspect of law which imposes a duty to warn of unpredictable wrongdoing at the hands of a third party.

Similarly, Plaintiff fails to explain how Defendant Allegiant Air should have known what the TSA threat assessment procedures entail or that they could potentially expose or exacerbate Plaintiff's medical condition. The federal regulations governing "the operation of TSA security areas emphasize the exclusive control that the TSA exercises over those areas." *Hogan v. Nw. Airlines, Inc.*, No. 11-CV-14888, 2013 WL 607852, at *3 (E.D. Mich. Feb. 19, 2013). They "confer an absolute authority on the TSA personnel within the screening area to the exclusion of all other airport

staff or patrons." *Id.; see also* 49 U.S.C. § 44901; 49 C.F.R. §§ 1540.101–1540.117. And courts have gone so far to characterize the screening area as a purely "federal facility" wholly separate from the airport in general. *Narvaez v. Am. Airlines, Inc.*, No. 09-CIV-6397, 2010 WL 5072114, at *2 (S.D.N.Y. Dec. 13, 2010). Given the intentional exclusion of airlines' participation in the TSA screening process, the Court cannot reasonably infer airline personnel possess any knowledge beyond that of an average person of what the TSA threat assessment procedures entail. Indeed, Plaintiff himself explains those procedures are sensitive material not generally available, even to this Court. (Doc. 36 at 20). As there is no reason to believe Defendant Allegiant Air possessed any unequal knowledge about the TSA threat assessment procedures, there is no basis to impose a duty to explain those procedures to Plaintiff or explain how those procedures could potentially expose or exacerbate a medical condition airline personnel also had no reason to know of. *See Hutchison*, 910 F.3d at 1022.[10]

Put simply, Plaintiff fails to demonstrate Defendant Allegiant Air had the requisite knowledge to give him the notice he believes was due. Without such knowledge, Defendant Allegiant Air can have no duty to warn. Plaintiff's claims for negligence and NIED must therefore be dismissed. Furthermore, the Court does not believe Plaintiff can amend his complaint to state facts giving rise to the duty he believes was due; Counts XVIII and XIX are therefore dismissed with prejudice. *See*

---

[10] Even if Defendant Allegiant Air had reason to know Plaintiff would be required to submit to a pat down, Plaintiff does not indicate Defendant Allegiant Air had any knowledge that a pat down would be dangerous or harmful to him. (*See, e.g.*, doc. 12 (repeatedly referring to Plaintiff's medical condition as hidden and private)).

1:20-cv-01280-JBM-JEH    # 46    Page 22 of 40

*R3 Composites Corp. v. G&S Sales Corp.*, 960 F.3d 935, 946 (7th Cir. 2020) ("District

courts may deny leave to amend . . . where there is a good reason to do so: futility,

undue delay, prejudice, or bad faith." (internal quotation marks omitted)).

### 2.  Plaintiff Cannot Establish IIED

Illinois Courts also look to the Restatement (2d) of Torts for guidance on IIED

claims. *Schweihs v. Chase Home Fin., LLC*, 2016 IL 120041, ¶¶ 49–51, 77 N.E.3d 50,

62–63. The tort consists of three elements:

> First, the conduct involved must be truly extreme and outrageous.
> Second, the actor must either intend that his conduct inflict severe
> emotional distress or know that there is at least a high probability that
> his conduct will cause severe emotional distress. Third, the conduct
> must in fact cause severe emotional distress.

*Id.* ¶ 50; *see also* Restatement (2d) of Torts § 46(1) (1965).  Liability for IIED extends

only in the most egregious of cases.

> It is clear that the tort does not extend to mere insults, indignities,
> threats, annoyances, petty oppressions, or other trivialities. It has not
> been enough that the defendant has acted with an intent which is
> tortious or even criminal, or that he has intended to inflict emotional
> distress, or even that his conduct has been characterized by malice, or a
> degree of aggravation which would entitle the plaintiff to punitive
> damages for another tort. Liability has been found only where the
> conduct has been so outrageous in character, and so extreme in degree,
> as to go beyond all possible bounds of decency, and to be regarded as
> atrocious, and utterly intolerable in a civilized community. The law
> intervenes only where the distress inflicted is so severe that no
> reasonable man could be expected to endure it. The intensity and the
> duration of the distress are factors to be considered in determining the
> severity.

*Schweihs*, 2016 IL 120041, ¶ 51 (internal citations omitted).

Plaintiff's IIED claim is also predicated on Defendant Allegiant Air's failure to

explain the TSA threat assessment procedures and warn him "that his reasonable

expectation of privacy could be violated through no fault of his own during the
security screening process[.]" (Doc. 12 at 22). However, the Court has determined
Defendant Allegiant Air had no responsibility give any such warning(s). Failure to
provide an explanation or warning about matters outside one's knowledge does not
amount to the type of extreme or outrageous conduct necessary to predicate an IIED
claim. And Defendant Allegiant Air took no part in the actual conduct Plaintiff argues
caused his emotional distress: the TSA screening. There is simply no basis for an
IIED claim against Defendant Allegiant Air. Given Defendant Allegiant Air's total
lack of participation in the conduct which allegedly caused Plaintiff emotional
distress, the Court finds any amendment would be futile. Count XX is therefore
dismissed with prejudice. *See R3 Composites Corp.*, 960 F.3d at 946.

In sum, Defendant Allegiant Air's Motion for Judgment on the Pleadings
Pursuant to Rule 12(c) and Motion to Dismiss for Failure to State a Claim Pursuant
to Rule 12(b)(6) is granted. Defendant Allegiant Air is entitled to judgment on the
pleadings with respect to Counts XV, XVI, and XVII, and Counts XVIII, XIX, XX are
dismissed with prejudice.

## II.   The Federal Defendants' and Defendant Pekoske's Motions to Dismiss

Plaintiff asserts a myriad of claims against the Federal Defendants. Plaintiff
claims the two TSA encounters were violations of the Fourth Amendment (committed
by both Defendant TSA and Defendant Pekoske, individually under *Bivens v. Six
Unknown Agents*, 403 U.S. 388 (1971)) (Counts I–IV, V, VII); the right to privacy
under the Illinois, Arizona, and United States Constitutions (Counts I–IV); the right
to due process under the Illinois, Arizona, and United States Constitutions

23

(committed by both Defendant TSA and Defendant Pekoske, individually under *Bivens*) (Counts I–IV, VI, VIII); and the Rehabilitation Act (Count XXI). (Doc. 12 at 13–17, 24–26). Plaintiff further argues Defendant TSA's failure to give notice of the screening process and failure to warn of known dangers associated with it constitute negligence and NIED (Counts I–IV). (Doc. 12 at 13–15). In addition to monetary damages, Plaintiff seeks injunctive relief in the following forms: (1) a permanent injunction preventing Defendant TSA from singling out Plaintiff and unlawfully discriminating against him on the basis of his disability (Count XXI), (2) a permanent injunction prohibiting the Federal Defendants from denying him the right to travel, and (3) an injunction ordering the Federal Defendants and Defendant L3 to either destroy any "screening data images" of him or turn any such images or data over to him. (Doc. 12 at 26–27).

The Federal Defendants argue these claims must be dismissed for several reasons:

> First, in accordance with the doctrine of sovereign immunity, Plaintiff cannot maintain state constitutional claims against the federal government. Second, Plaintiff cannot recover monetary damages from the Federal Defendants for his purported constitutional violations. Third, insofar as Plaintiff's claims against the Federal Defendants challenge TSA's Standard Operating Procedures for the security screening of airline passengers, such claims must be brought in the United States Courts of Appeals pursuant to 49 U.S.C. § 46110. Fourth, Plaintiff has named the wrong defendant for the tort claims he asserts and, thus, those claims should be dismissed. Finally, he lacks standing for the declaratory and injunctive relief he demands.

(Doc. 33 at 2). Individually, Defendant Pekoske further argues Counts V–VIII must be dismissed because *Bivens* relief is not available for Plaintiff's claims. (Doc. 34). The Court must first address matters of justiciability.

24

*A.   Subject Matter Jurisdiction*

The Federal Defendants argue 49 U.S.C. § 46110 deprives the Court of subject

matter jurisdiction over several of Plaintiff's claims. This is a facial challenge to the

Court's subject matter jurisdiction, so the Court accepts all well-pleaded facts as true.

*See Apex Digit.*, 572 F.3d at 443–44.

> Section 46110(a) reads:
>
> [A] person disclosing a substantial interest in an order issued by the
> Secretary of Transportation (or the Administrator of the Transportation
> Security Administration with respect to security duties and powers
> designated to be carried out by the Administrator of the Transportation
> Security Administration or the Administrator of the Federal Aviation
> Administration with respect to aviation duties and powers designated
> to be carried out by the Administrator of the Federal Aviation
> Administration) in whole or in part under this part, part B, or subsection
> (l) or (s) of section 114 may apply for review of the order by filing a
> petition for review in the United States Court of Appeals for the District
> of Columbia Circuit or in the court of appeals of the United States for
> the circuit in which the person resides or has its principal place of
> business.

Section 46110(c) further provides, in relevant part, that "the courts of appeals have

exclusive jurisdiction to affirm, amend, modify, or set aside any part of the order."

*Merritt v. Shuttle, Inc.*, 245 F.3d 182, 187 (2d Cir. 2001) (*Merritt II*) (internal

quotation marks and emphasis omitted).

TSA's screenings are conducted pursuant to, *inter alia*, its Standard Operating

Procedures (SOP), which set forth the threat assessment procedures central to this

lawsuit. The SOP has been widely and uniformly held to be a final order within the

meaning of § 46110(a), and challenges to the SOP therefore lie within the exclusive

jurisdiction of the courts of appeals. *See Blitz v. Napolitano*, 700 F.3d 733, 740 (4th

Cir. 2012); *Corbett v. United States*, 458 F. App'x 866, 869–71 (11th Cir. 2012); *Roberts*

*v. Napolitano*, 463 F. App'x 4, 4–5 (D.C. Cir. 2012); *Redfern v. Napolitano*, 727 F.3d 77, 83 n.3 (1st Cir. 2013); *Scruggs v. McAleenan*, No. 18-CV-2109, 2019 WL 4034622, at *1 (N.D. Ill. Aug. 27, 2019).

Furthermore, any claims "inescapably intertwined" with review of such an order are subject to the jurisdictional limitation in § 46110. *Merritt II*, 245 F.3d at 187; *see also Merritt v. Shuttle, Inc.*, 187 F.3d 263, 271 (2d Cir. 1999) (*Merritt I*). "A claim is inescapably intertwined in this manner if it alleges that the plaintiff was injured by such an order and that the court of appeals has authority to hear the claim on direct review of the agency order." *Merritt II*, 245 F.3d at 187 (citing *City of Tacoma v. Taxpayers of Tacoma*, 357 U.S. 320, 336 (1958)). "[T]he test for determining whether [§ 46110] precludes a district court from hearing a particular claim is . . . whether the claim "could and should have been" presented to and decided by a court of appeals. *Id.* at 188 (quoting *City of Tacoma*, 357 U.S. at 339). Thus, a district court must consider whether resolution of the claim would require it to affirm, amend, modify, or set aside any part of the order; if so, the claim lies in the exclusive jurisdiction of the courts of appeals. *See id.*

In keeping with this authority, courts have routinely held constitutional challenges to TSA screening procedures lie within the exclusive jurisdiction of the courts of appeals under § 46110. *Corbett*, 458 F. App'x at 871 ("[T]o determine whether the security screening procedures set forth in the SOP comply with the Fourth Amendment, a court must necessarily review the procedures and merits surrounding the . . . order." (internal quotation marks omitted)); *see also Gilmore v.*

26

*Gonzales*, 435 F.3d 1125, 1132–33 (9th Cir. 2006) (holding First and Fourth Amendment challenges to TSA's pre-SOP standard requirement to provide identification were precluded by § 46110); *Roberts*, 463 F. App'x at 5 (holding "claims for injunctive and declaratory relief directly seek review of orders issued by TSA" and therefore fall under the purview of § 46110).

The First Circuit's decision in *Ruskai v. Pistole*, 775 F.3d 61 (1st Cir. 2014), is particularly illustrative. There, the plaintiff—who could not pass through some TSA security checkpoints without submitting to pat-down searches due to her metallic joint replacement—argued TSA screening procedures, as applied to her, violated both the Fourth Amendment and the Rehabilitation Act; she also challenged TSA's refusal to allow her an exception to the pat-down requirement. *Id.* at 63–65. The First Circuit concluded those claims were within its exclusive subject matter jurisdiction under § 46110. *Id.* at 65. Plaintiff's claims, along with their factual bases, are strikingly similar to those in *Ruskai*, yet he fails to explain how they are not direct challenges to the SOP or inescapably intertwined with review thereof. Rather, he generally states his claims arise under common law negligence and argues the merits of his negligence claims. (Doc. 38 at 18–20). As most of his claims against the Federal Defendants are premised on constitutional and statutory law (*see* docs. 12 at 13–17, 24–26; 38 at 7–18), his arguments are misplaced.

27

Applying the jurisdictional filter in § 46110 to the case at hand, it is clear the Court lacks jurisdiction to hear Plaintiff's constitutional[11] and Rehabilitation Act claims against Defendant TSA in Counts I–IV and XXI. *See Ruskai*, 775 F.3d at 65; *Corbett*, 458 F. App'x at 871. The same reasoning dispenses of Plaintiff's claims against Defendant Pekoske in Counts V–VIII, which allege he is individually liable for the same conduct. *See Merritt I*, 187 F.3d at 272 (finding *Bivens* claims for alleged constitutional violations arising from a Federal Aviation Administration (FAA) adjudication were inescapably intertwined with review of that adjudication).[12] Additionally, Plaintiff's requests for (1) a permanent injunction preventing Defendant TSA from unlawfully discriminating against him on the basis of his disability (Count XXI) and (2) a permanent injunction prohibiting the Federal Defendants from denying him the right to travel (doc. 12 at 26)[13] are, at their core, requests for an exception to the SOP, as they would essentially invalidate certain portions of the SOP as to him, *see Roberts*, 463 F. App'x at 5; *Ruskai*, 775 F.3d at 65. Therefore, they too must be brought to the court of appeals in the first instance.

---

[11] Specifically, the Court is referring to the Fourth Amendment claims (Counts I–IV, V, VII); the claims based on right to privacy under the Illinois, Arizona, and United States Constitutions (Counts I–IV); and the claims based on the right to due process under the Illinois, Arizona, and United States Constitutions (Counts I–IV, VI, VIII).
[12] Consequently, Defendant Pekoske's individual Motion to Dismiss for Failure to State a Claim (doc. 34) is moot.
[13] The request for an injunction ordering the Federal Defendants and Defendant L3 to either destroy any "screening data images" of him or turn any such images or data over to him is not a stand-alone claim but rather is sought as a remedy for the alleged constitutional violations. (*See* doc. 12 at 26–27). Since this injunctive relief is a remedy for claims outside the Court's subject matter jurisdiction, the relief must be denied here, to the extent it applies to the Federal Defendants.

What remains are Plaintiff's claims for negligence and NIED under the Federal Tort Claims Act (FTCA). On this score, the *Merritt* litigation is instructive. In *Merritt*, a commercial airline pilot was discharged and had his license suspended following a bad-weather flight that nearly resulted in a crash. *Merritt II*, 245 F.3d at 184–85. The pilot thereafter raised a litany of claims against multiple defendants, including claims that government officials were individually liable under *Bivens* for depriving him of his rights to due process under the Fifth Amendment (at issue in *Merritt I*) and that the United States was liable under the FTCA for negligently failing to warn him of the approaching bad weather (at issue in *Merritt II*). *Merritt II*, 245 F.3d at 185. The Court ultimately found the *Bivens* claims were precluded from the district court's jurisdiction by § 46110 because they directly challenged an adjudication resulting in a final order by the FAA (the order suspending his pilot license), while the FTCA claim was not precluded by § 46110 because it challenged conduct unrelated to that adjudication and order. *Id.* at 189–90. The court went on to suggest, as a general matter, FTCA claims are not precluded by § 46110. *Id.* at 190–91 (citing *Beins v. United States*, 695 F.2d 591, 597–98 (D.C. Cir. 1982)).

Similar to the *Merritt* litigation, the Court finds Plaintiff's FTCA claims are not precluded from its jurisdiction by § 46110, while his *Bivens* and constitutional claims are. Plaintiff's FTCA claims do not allege he was injured or aggrieved by any particular TSA order or otherwise attack any TSA official's conduct during the August 2018 screenings; in fact, he explicitly states his FTCA claims do not attack the design, implementation of, or adherence to the SOP. (Doc. 38 at 18–20). Rather, he claims he

29

was injured by Defendant TSA's failure to warn him about the screening procedures and what they entail before he presented to TSA for screening. (*See* docs. 12 at 13–15; 38 at 18–20). Furthermore, he does not allege the SOP contains any notice requirement which was not followed or otherwise advocate for an amendment to the SOP adding such a requirement; instead, he suggests he simply would not have flown had he known he would be subject to a pat-down search while symptomatic. (*See* doc. 38 at 11 ("[I]f he had been given fair notice of the process, he never would have booked a ticket."). For these reasons, the Court concludes Plaintiff's FTCA claims do not challenge the SOP or any other TSA order and therefore fall outside the purview of § 46110. *See Merritt II*, 245 F.3d at 189–91.

B.   *Plaintiff's FTCA Claims Must be Dismissed*

The FTCA permits litigants to raise certain tort claims against the United States "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 1346(b)(1). The relief permitted by the FTCA is an exclusive remedy for damages caused by federal employees acting in the course of their employment. *See* 28 U.S.C. § 2679. In FTCA cases, "the United States is the only proper defendant." *Smith v. United States*, 678 F. App'x 403, 406 (7th Cir. 2017).

Plaintiff's claims for negligence and NIED against Defendant TSA were clearly brought under the FTCA. (*See* doc. 12 at 3 (invoking the FTCA jurisdictional provision, § 1346(b)(1))). As Defendant TSA is not the proper party, the FTCA claims against it must be dismissed. *See Smith*, 678 F. App'x at 406 (affirming the dismissal

30

of FTCA claims brought against a government agency as opposed to the United States).

Plaintiff argues the United States should simply be substituted as the correct party, citing the principle that *pro se* pleadings must be liberally construed coupled with the certification process outlined in § 2679(d). (Doc. 38 at 4–7). He is incorrect. Though *pro se* complaints are indeed liberally construed, liberal construction does not include *sua sponte* or unilateral substitution of parties against whom Plaintiff has not elected to sue; Plaintiff is master of his complaint, *see Caterpillar Inc. v. Williams*, 482 U.S. 386, 398–99 (1987). Further, he misunderstands the certification provision, § 2679(d), which merely allows the Attorney General to recategorize state-law tort claims brought against federal employees as FTCA claims where appropriate. *Matthews v. United States*, 805 F. Supp. 712, 715 (E.D. Wis. 1992), *aff'd*, 28 F.3d 1216 (7th Cir. 1994) ("[T]he provision simply means that when an action is brought against a federal employee pursuant to some other grant of jurisdiction—say, diversity jurisdiction—it may be converted into an FTCA case upon the Attorney General's certification."). Plaintiff's First Amended Complaint made clear he was suing for negligence and NIED under the FTCA, so certification under § 2679(d) was unnecessary.

Nevertheless, even if the Court were to order the United States be substituted for Defendant TSA, Plaintiff's claims would fail; the Court can conceive of no possible scenario in which United States officials had or breached the duty Plaintiff argues was owed to him. As stated, a plaintiff alleging negligence must ultimately prove

31

"existence of a duty, the defendant's breach of that duty, and that the breach proximately caused the plaintiff's resulting injuries." *Roh*, 881 F.3d at 973. And, a direct-victim plaintiff alleging NIED in Illinois must ultimately prove the elements of negligence as well as "emotional distress and . . . a contemporaneous physical injury or impact." *Schweihs*, 2016 IL 120041, ¶ 31 (quoting *Corgan*, 143 Ill. 2d at 303). A duty to warn arises only "where there is unequal knowledge, actual or constructive [of a dangerous condition], and the defendant[,] possessed of such knowledge, knows or should know that harm might or could occur if no warning is given." *Hutchison*, 910 F.3d at 1022 (internal quotation marks omitted).

To the extent Plaintiff argues he was owed a warning prior to his arrival for TSA screening, his argument fails because he repeatedly maintains his medical condition was hidden and private. Absent knowledge the screening process would be dangerous for Plaintiff, no duty to warn can attach.[14] And by the time TSA officials became aware of some extent of Plaintiff's medical condition—due to his warning that he was suffering a serious medical emergency and "being touched at his right groin would result in extreme physical pain and could endanger his life" (*e.g.*, doc. 12 at 7, 10)—TSA officials *had* warned him that a pat-down search was required (doc. 12 at 5–7, 8–11), precluding a finding of breach. The Court is sympathetic to Plaintiff's

---

[14] Further, the United States is under no obligation to warn of a process required by law, as previously stated. And the notion that Plaintiff was owed a duty to disclose the details of TSA screening procedures is ludicrous. Plaintiff himself admits the TSA SOP is sensitive security information (*see* doc. 36 at 20); widespread public disclosure of this type of sensitive security information—which would undoubtedly result if Plaintiff's argument were to prevail—could compromise national security interests.

plight and psychological struggles, but his allegations simply do not establish any viable claim the United States breached any duty owed to him.

In sum, the Federal Defendant's Motion to Dismiss (doc. 33) is granted, and Defendant Pekoske's Motion to Dismiss for Failure to State a Claim (doc. 34) is denied as moot. Counts I, II, III, and IV are dismissed in part for want of subject matter jurisdiction and in part for failure to state a claim, and Counts V, VI, VII, VIII, and XXI are dismissed for want of subject matter jurisdiction. Because the Court finds substituting the United States for Defendant TSA would be futile, the Court will not allow Plaintiff leave to amend Counts I–IV. *R3 Composites Corp.*, 960 F.3d at 946.

## III.    Defendant L3's Motion to Dismiss

Plaintiff's claims against Defendant L3, contained in Counts IX–XIV, mirror those asserted against Defendant Allegiant Air. He asserts a set of claims— negligence, NIED, and IIED—for both TSA encounters.[15] (Doc. 12 at 17–20). Defendant L3 argues the claims must be dismissed for several reasons. First, Defendant L3 argues the claims based on the Illinois encounter (Counts XII–XIV) are barred by res judicata and the claims based on the Arizona encounter (Counts IX–XI) are therefore time-barred. (Doc. 37 at 1–2). Second, in the alternative, Defendant L3 argues the claims must be dismissed pursuant to the Support Anti-Terrorism by

---

[15] As was the case with the claims asserted against Defendant Allegiant Air, the Court finds Plaintiff's claims against Defendant L3 sound in tort, despite invoking various constitutional principles. Again, "[m]ost rights secured by the Constitution are protected only against infringement by governments, so . . . the conduct allegedly causing the deprivation of a federal right [must] be fairly attributable to the State." *Listecki*, 780 F.3d at 741 (internal quotation marks omitted). Plaintiff fails to explain how the actions of Defendant L3, a private corporation, may be fairly attributable to a state government or to the federal government.

Fostering Effective Technologies Act of 2002, 6 U.S.C. § 441 *et seq.* (SAFETY Act). (Doc. 37 at 2). Finally, and also in the alternative, Defendant L3 argues Plaintiff has failed to state a claim. (Doc. 37 at 2).

A.  *Res Judicata and Statute of Limitations*

Invoking the Seventh Circuit's decision in *Arrigo v. Link*, 836 F.3d 787, 799 (7th Cir. 2016), Defendant L3 argues a decision by the Arizona District Court in a prior suit between it and Plaintiff precludes his claims based on the Illinois encounter. (Doc. 37 at 8–11). Defendant L3 further argues because those claims are res judicata, they are a legal nullity and cannot serve to extend the statute of limitations for Plaintiff's claims based on the Arizona encounter, which were added in the First Amended Complaint after the two-year statute of limitations had run. (Doc. 37 at 11–13).

It is worth noting both res judicata and statutes of limitations provide affirmative defenses and may not be the basis for dismissal under Rule 12 unless "it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law," *Parungao v. Cmty. Health Sys., Inc.*, 858 F.3d 452, 457 (7th Cir. 2017) (internal quotation marks omitted). The Court is permitted to take judicial notice of the docket in *Muir v. L3Harris Tech., Inc.*, No. 2:19-cv-05887 (D. Ariz.), Plaintiff's prior suit against Defendant L3. *See Daniel v. Cook Cty.*, 833 F.3d 728, 742 (7th Cir. 2016).

In the Arizona lawsuit, Plaintiff filed various claims against Defendant L3 based on the Arizona encounter. *Muir*, No. 2:19-cv-05887, doc. 1-3. In response to Defendant L3's motion to dismiss his First Amended Complaint, Plaintiff attempted

to file a Second Amended Complaint, which added Defendants TSA and Pekoske as well as claims for, *inter alia*, negligence and NIED based on the Illinois encounter. *See id.*, doc. 23 at 28–32. Despite the Ninth Circuit's policy of "extreme liberality" pertaining to amendment, the Arizona District Court denied Plaintiff leave to file his Second Amended Complaint:

> In violation of Local Rule of Civil Procedure 15.1, Plaintiff has not "indicate[d] in what respect the [second amended complaint] differs from the pleading which it amends[.]" A comparison of the two pleadings, however, shows that the second amended complaint adds two new defendants – the TSA and its Administrator – and asserts claims that clearly are without merit. *See* Doc. 23 at 23-43 (alleging violations of the Eighth Amendment and Illinois criminal statutes). Plaintiff has provided no basis for adding defendants and expanding the scope and nature of his claims. Moreover, Defendant L3Harris has now twice moved to dismiss Plaintiff's claims. Docs. 14, 22. Requiring Defendant to file a third motion to dismiss would be unfair and unduly prejudicial. The Court will deny Plaintiff leave to amend his first amended complaint. *See Chodos v. W. Publ'g Co.*, 292 F.3d 992, 1003 (9th Cir. 2002) (explaining that a district court's discretion to deny leave to amend is "particularly broad" where the plaintiff previously amended the complaint).

*Id.*, doc. 24 at 2–3. Plaintiff thereafter filed the instant lawsuit and voluntarily dismissed the Arizona lawsuit under Federal Rule of Civil Procedure 41(a)(1)(A)(i), *id.*, doc. 25.

The fact Plaintiff voluntarily dismissed the Arizona lawsuit puts a wrench in Defendant L3's arguments. "A suit that is voluntarily dismissed under Rule 41(a) generally is treated as if it had never been filed." *Nelson v. Napolitano*, 657 F.3d 586, 587 (7th Cir. 2011). Defendant L3 has not identified any case in which preclusion flowed from a case which was voluntarily dismissed, and the Court has found none. Even in *Arrigo*, the Seventh Circuit recognized a final judgment on the merits must

support a res judicata finding. *Arrigo*, 836 F.3d 799–800; *see also Sklyarsky v. Means-Knaus Partners, L.P.*, 777 F.3d 892, 896 (7th Cir. 2015) (finding error where a trial court found preclusion while the first suit "was still pending and thus the interim ruling denying leave to [amend] was not a final decision having preclusive effect"). For these reasons, the Court is not at this time willing to dismiss on res judicata grounds. That said, the Court recognizes the policies espoused in *Arrigo* could apply to situations such as this[16] and therefore declines to foreclose the matter at this point.

### B.    SAFETY Act

Defendant L3 next argues Plaintiff's claims must be dismissed under the government contractor defense provided by the SAFETY Act, 6 U.S.C. § 442(d)(1). (Doc. 37 at 13–15). In support of this defense, Defendant L3 attaches documents to its Motion, including a declaration from its former Vice President of Contracts (doc. 44) and a Safety Act Certification from the Department of Homeland Security (doc 37-5).

"Generally, a district court cannot consider evidence outside the pleadings to decide a motion to dismiss without converting it into a motion for summary judgment." *Jackson v. Curry*, 888 F.3d 259, 263 (7th Cir. 2018). The documentation on which Defendant L3 relies for its SAFETY Act defense do not appear to fall within the narrow exceptions to this general rule. *See Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019–20 (7th Cir. 2013) (noting consideration of a motion to dismiss

---

[16] The holding in *Arrigo* "promotes predictability in the judicial process, preserves the limited resources of the judiciary, and protects litigants from the expense and disruption of being haled into court repeatedly." *Arrigo*, 836 F.3d at 799 (internal quotation marks omitted).

requires consideration of "the complaint itself, . . . documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice"). The Court therefore declines to resolve the SAFETY Act defense at this stage of the proceedings.

C.    *Plaintiff Failed to State a Claim Against Defendant L3*

Plaintiff alleges Defendant L3 committed negligence, NIED, and IIED. Defendant L3 argues these claims fail as a matter of law. (Doc. 37 at 15–21).

### 1.  Plaintiff Cannot Establish Negligence or NIED

As stated, a plaintiff alleging negligence in Illinois[17] must ultimately prove "existence of a duty, the defendant's breach of that duty, and that the breach proximately caused the plaintiff's resulting injuries." *Roh*, 881 F.3d at 973. And, a direct-victim plaintiff alleging NIED in Illinois must ultimately prove the elements of negligence as well as "emotional distress and . . . a contemporaneous physical injury or impact." *Schweihs*, 2016 IL 120041, ¶ 31 (quoting *Corgan*, 143 Ill. 2d at 303).[18]

---

[17] The Court again recognizes some events giving rise to Plaintiff's claims occurred in Arizona, thus raising a possible choice of law issue. However, as neither party identifies a relevant conflict between Arizona and Illinois law pertaining to negligence claims, the Court will apply Illinois law. *J.S.T. Corp.*, 965 F.3d at 577 n.1 ("[W]hen neither party raises a conflict of law issue in a [supplemental jurisdiction or] diversity case, a federal court should apply the law of the state in which it sits.").
[18] According to Defendant L3, a claim for NIED in Arizona "requires that the plaintiff witness an injury to a closely related person, suffer mental anguish that manifests itself as a physical injury, and be within the zone of danger so as to be subject to an unreasonable risk of bodily harm created by the defendant," *Guerra v. State*, 237 Ariz. 183, 186, 348 P.3d 423, 426 (2015). (Doc. 37 at 19). However, these elements clearly apply to indirect-victim claims, and Plaintiff's claims are direct-victim claims. As neither party has identified a conflict between Illinois and Arizona law pertaining to

As Defendant L3 notes, the Amended Complaint is devoid of any allegations establishing a duty. Plaintiff's Response does little to explain his theory. Therein, he discusses a hodgepodge of matters, asserting at various points a duty arose because he had a special relationship with Defendant L3 and there was a common enterprise among Defendants L3, TSA, and Allegiant Air. (Doc. 42 at 15–17). Plaintiff also asserts "profit motive[s]" play a factor in the duty analysis. (Doc. 42 at 17–18). Plaintiff argues Defendant L3 was required "to reveal all important information regarding the advanced technology components of the threat assessment process so that [he] could have the opportunity to exercise his right to avoid them by choosing not to fly." (Doc. 42 at 16). All the while, Plaintiff cites no authority supporting his position.

To start, Plaintiff alleges no facts indicating he had a "special relationship," in the context of duty formation, with Defendant L3. *See Iseberg*, 227 Ill. 2d at 88. And, as previously stated, a duty to warn arises only "where there is unequal knowledge, actual or constructive [of a dangerous condition], and the defendant[,] possessed of such knowledge, knows or should know that harm might or could occur if no warning is given." *Hutchison*, 910 F.3d at 1022 (internal quotation marks omitted). Plaintiff alleges no facts from which the Court can infer Defendant L3 would or could have had any knowledge of Plaintiff's medical condition or that the equipment it developed would trigger the events which allegedly caused Plaintiff's damages.

---

direct-victim claims for NIED, the Court will apply Illinois law, *J.S.T. Corp.*, 965 F.3d at 577 n.1.

In sum, Plaintiff has failed to identify any legal theory which would impose a duty on Defendant L3 in this context. His claims for negligence and NEID must therefore be dismissed. Because the Court does not believe Plaintiff can amend his complaint to state facts sufficient to state claims for negligence and NIED, Counts IX, X, XII, and XIII are dismissed with prejudice. *See R3 Composites Corp.*, 960 F.3d at 946.

### 2. Plaintiff Cannot Establish IIED

As stated, the tort of IIED consists of three elements:

> First, the conduct involved must be truly extreme and outrageous. Second, the actor must either intend that his conduct inflict severe emotional distress or know that there is at least a high probability that his conduct will cause severe emotional distress. Third, the conduct must in fact cause severe emotional distress.

*Schweihs*, 2016 IL 120041, ¶ 50; *see also* Restatement (2d) of Torts § 46(1) (1965). Liability extends only in the most egregious of cases. *See Schweihs*, 2016 IL 120041, ¶ 51.

The basis for Plaintiff's IIED claim against Defendant L3 is unclear. The Amended Complaint vaguely suggests various violations of state and federal constitutional rights, such as the right to privacy, constitute IIED (doc. 12 at 18, 20); the Response to Defendant L3's Motion to Dismiss fails to address IIED at all (*see* doc. 42 at 15–20). This is wholly insufficient to survive scrutiny under Rule 12(b)(6). Further, given Plaintiff had no direct interaction with Defendant L3, the Court finds amendment would be futile. Counts XI and XIV are therefore dismissed with prejudice. *See R3 Composites Corp.*, 960 F.3d at 946.

In sum, Defendant L3's Motion to Dismiss is granted; Counts IX, X, XI, XII, XIII, and XIV are dismissed with prejudice.

## CONCLUSION

IT IS THEREFORE ORDERED that:

1. Defendant Allegiant Air's Motion for Judgment on the Pleadings Pursuant to Rule 12(c) and Motion to Dismiss for Failure to State a Claim Pursuant to Rule 12(b)(6) (doc. 30) is GRANTED; Defendant Allegiant Air is granted judgment on the pleadings with respect to Counts XV, XVI, and XVII, and Counts XVIII, XIX, and XX are DISMISSED WITH PREJUDICE.

2. The Federal Defendant's Motion to Dismiss (doc. 33) is GRANTED; Counts I, II, III, and IV are DISMISSED WITH PREJUDICE in part for want of subject matter jurisdiction and in part for failure to state a claim, and Counts V, VI, VII, VIII, and XXI are DISMISSED for want of subject matter jurisdiction.

3. Defendant Pekoske's Motion to Dismiss for Failure to State a Claim (doc. 34) is DENIED AS MOOT.

4. Defendant L3's Motion to Dismiss (doc. 37) is GRANTED; Counts IX, X, XI, XII, XIII, and XIV are DISMISSED WITH PREJUDICE.

This matter is terminated, and judgment shall enter in favor of all defendants.

SO ORDERED.

Entered this 22nd day of January 2021.

s/ Joe B. McDade
JOE BILLY McDADE
United States Senior District Judge

29.    Based solely on the false right groin threat alarm generated by L3's proprietary ATR software, TSA moved Muir for mandatory additional interrogation and separated him from his personal property, which was cleared to enter the sterile area.

30.    TSA informed Muir that a physical screening of his right groin was required.

31.    Muir was not aware at the time that: (1) his hidden physical disorder at his right groin and his private marital healthcare choices regarding that disorder were the reasons that a false ATR software threat alarm was triggered, (2) he was required to undergo a physical "pat-down" to resolve the false ATR software threat alarm at his right groin, and (3) that no other options were available to clear ATR software threat alarms, even for serious medical emergencies.

32.    Muir informed TSA that he was experiencing a serious medical emergency and that nobody, including his doctor, had ever touched him at his right groin during a disorder-related medical emergency and that being touched at his right groin would result in extreme physical pain and could endanger his life and he ordered TSA not to touch him at his right groin.

33.    TSA, as a matter of strict policy, consciously and deliberately disregarded Muir's serious medical needs, informed Muir that a physical screening of his right groin was mandatory and coerced Muir to act against his will in order to secure his lawful release from TSA.

34.    Muir had no criminal record and had never been arrested or charged with any crime or offense and strongly desired to keep his reputation intact and to not be arrested and sent to jail, especially considering he had followed all laws, rules, procedures and TSA personnel instructions and was desperate to reunite with his wife in the sterile area so that she could help him with the symptoms of his medical emergency, as she had done for years.

While it is undisputed that Allegiant is a private entity, the TSA checkpoint threat assessment process embedded within the airplane boarding process is a joint effort between Allegiant, the United States government and L3, a United States government defense contractor.

Based on this arrangement, Allegiant is utilizing the power and authority of the federal government as part of its regular business and protections of the U.S. Constitution are therefore automatically triggered. Allegiant is the bridge between Muir and the U.S. Constitution because Muir would not have had contact with TSA (or L3) were it not for his contract of carriage with Allegiant.

Similarly, claims brought under the Illinois and Arizona State Constitutions must survive because Allegiant and TSA rely on local law enforcement officers at the airport to enforce the federal regulations regarding the checkpoint because TSA does not have arrest powers. This constitutes State action in both Illinois and Arizona and the protections offered by both state constitutions are automatically triggered because Muir faced arrest by local law enforcement if he failed to follow TSA orders while in TSA control and Allegiant benefitted from the State control of Muir during the boarding process.

Muir did not simply experience an offensive screening, but one that put his life in danger. This life-threatening, dehumanizing, improperly motivated custodial interrogation process was initiated by a government defense contractor A.I. as part of an unreviewable and final process with no humans in the decision loop. The TSA checkpoint is not a Constitution-free zone and Allegiant's special relationship highest degree of care duty requires Allegiant to do due diligence with regards to all aspects of the contract of carriage and disclose foreseeable safety risks to Muir. Constitutional rights concerning due process, reasonable search and the reasonable

### ii.    Degrading Treatment and Dehumanization

Muir was publicly degraded at IWA when, in front of many people at a busy airport checkpoint, he was coerced to submit to a physical pat-down at the exact site of his painful medical emergency solely because of his disability in order to be released from State interrogation and avoid further punishment.

No one other than Muir had ever touched his right groin during the type of serious health emergency Muir experienced on August 9, 2018. The fact that a TSA Agent, using the authority of the State, was the first person to violate Muir's personal security and sanity and touch him at his right groin during a medical emergency when not even medical professionals or his wife had touched him there "shocks the conscience" and cannot be tolerated in the United States of America.

### iii.    Cruel and Unusual Punishment

Muir was psychologically tortured and punished in a cruel and unusual fashion when he was forced to choose a punishment (arrest, criminal prosecution and civil fines or allow a TSO with no medical training to apply pressure to the exact site of his serious and painful medical emergency) in order to secure his lawful release from TSA control. Muir was unlawfully and unethically coerced to agree to be physically touched at the exact site of his congenital disability (for the purposes of State interrogation) during a medical emergency for the sole, arbitrary reason of having his hidden congenital disability at his right groin unlawfully revealed as a false threat alarm by L3's proprietary ATR software during passenger screening. A reasonable person would agree with Muir in his belief that using advanced technology (with probable military

Pekoske; his alleged injuries were inflicted – if at all – by individuals well-removed from ADM Pekoske's direct supervision. Undaunted, Plaintiff appears to propose that because ADM Pekoske is the head of TSA, then he must necessarily be responsible for the conduct of TSA personnel and, on that basis, personally liable to Plaintiff for any claimed misdeed. As indicated above, however, Bivens liability does not flow upward to a defendant based on the "knowledge or actions of persons they supervise." Burks, 555 F.3d at 593-94. A defendant will not be liable for a constitutional violation unless he was personally involved or acquiesced in the alleged constitutional violation. Id.; Gossmeyer v. McDonald, 128 F.3d 481, 494 (7th Cir. 1997). There is no respondeat superior liability for supervisory officials due to the allegedly unconstitutional acts of their subordinates. Rizzo v. Goode, 423 U.S. 362, 377 (1976). Without a showing of direct responsibility for the improper action, liability will not lie against a supervisory official. Rascon v. Hardiman, 803 F.2d 269, 273 (7th Cir. 1986). As a result, Plaintiff's claims are founded on a flawed premise. On this basis alone, ADM Pekoske should be dismissed from this action with prejudice.

**B. THE COURT SHOULD NOT EXTEND BIVENS TO PLAINTIFF'S CLAIMS.**

In order to fully dispel any suggestion of liability on the part of ADM Pekoske in this action, it is beneficial to further explain why Plaintiff's theory must fail. Constitutional-tort suits against state or local officials are governed by 28 U.S.C. § 1983. But ADM Pekoske, a federal official, acted solely under color of federal law. As § 1983 does not apply to ADM Pekoske, and "Congress did not create an analogous statute for federal officials," Abbasi, 137 S. Ct. at 1854, Plaintiff has no statutory claim against ADM Pekoske. Instead, he invokes Bivens, which, in very limited circumstances, may provide a judicially implied, non-statutory damages remedy against a federal official who violates the Constitution. A Bivens remedy, however, "is not an automatic entitlement," Wilkie v. Robbins, 551 U.S. 537, 550 (2007), and, indeed, it is "disfavored," Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009); accord Abbasi, 137 S. Ct. at 1857. The "antecedent" question here, then, as in any Bivens case, is whether the Court should create a non- statutory remedy, on its own, directly under the Constitution. Hernandez v.

8

A-44

Case: 21-1312    Document: 15    Filed: 04/16/2021    Pages: 86    E-FILED
Friday, 19 February, 2021 08:39:06 AM
Clerk, U.S. District Court, ILCD
14,15,APPEAL,CLOSED,PROSE,REFER

# U.S. District Court
## CENTRAL DISTRICT OF ILLINOIS (Peoria)
## CIVIL DOCKET FOR CASE #: <u>1:20−cv−01280−JBM−JEH</u>

| | |
|---|---|
| Muir v. United States Transportation Security Administration et al | Date Filed: 07/31/2020 |
| | Date Terminated: 01/22/2021 |
| Assigned to: Judge Joe Billy McDade | Jury Demand: Plaintiff |
| Referred to: Magistrate Judge Jonathan E. Hawley | Nature of Suit: 440 Civil Rights: Other |
| Cause: 42:1983 Prisoner Civil Rights | Jurisdiction: Federal Question |

**Plaintiff**

**Michael Gibson Muir**                        represented by   **Michael Gibson Muir**
                                                                19 Inglewood Lane
                                                                Bloomington, IL 61704
                                                                712−309−6121
                                                                *PRO SE*

V.

**Defendant**

**United States Transportation Security**      represented by   **Kimberly A Klein**
**Administration**                                              US ATTORNEY
                                                                Suite 400
                                                                One Technology Plaza 211 Fulton Street
                                                                Peoria, IL 61602
                                                                (309) 671−7361
                                                                Email: <u>Kimberly.Klein@usdoj.gov</u>
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

**Defendant**

**David P Pekoske**                            represented by   **Kimberly A Klein**
*Administrator, U.S. TSA, in his individual*                    (See above for address)
*capacity*                                                      *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

**Defendant**

**L3Harris Technologies, Inc.**                represented by   **Christopher J Raistrick**
*A Deleware for−profit corporation*                             ADLER MURPHY & MCQUILLEN LLP
                                                                Suite 2500
                                                                20 South Clark Street
                                                                Chicago, IL 60063
                                                                312−345−0700
                                                                Fax: 312−345−9860
                                                                Email: <u>craistrick@amm−law.com</u>
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

# Why is checkpoint screening hard?

- Passenger and baggage screening systems will not meet TSA's highest security objectives through incremental upgrades

- Current baggage screening cannot distinguish between some threats and some innocuous objects
  - Need more views (current x-ray technology only produces two or four views)
  - Need data beyond density

- Passenger screening causes frequent false alarms
  - Little to no depth/thickness information
  - No material discrimination

- Reliably discriminating the vast array of conventional and homemade threats requires **more information** than current methods produce
  - Not simply a data quality issue – need <u>new technical approaches</u> to detect challenging threats and reduce false alarms



Homeland
Security

Science and Technology

A-46

# So What, Who Cares

**The DHS S&T/TSA Passenger Screening Algorithm Challenge was a successful R&D effort under Apex Screening at Speed**

- Prize competitions engage "outsiders" to solve problems

- Prize competitions complement industrial R&D

- Prize competitions can be agile and cost-effective

- Care must be taken when setting up the competition to:
  - Attract maximum diversity of talent
  - Give entrants everything they need for success
  - Align competition outputs to operational requirements
  - Understand next steps



PASSENGER SCREENING
ALGORITHM CHALLENGE

**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

On September 19, 2017, DHS' Acquisition Review Board declared the AIT system at full operational capability[2] and approved it to move forward as a standalone program in January 2018. As a standalone program, TSA is required to oversee all operational activities of the program as described in the *DHS Systems Engineering Life Cycle Guidebook*.[3] These activities include operating and maintaining the system, performing operational analyses, conducting post-implementation reviews, and periodically reviewing the system's performance.

The Performance Management Branch, under TSA's Security Operations Division, oversees AIT deployed to passenger screening lanes. PMB's main oversight responsibility is to maximize use of the AIT system. In March 2018, PMB developed a field guide, *Improving Security Effectiveness by Optimizing Utilization of Advanced Imaging Technology*, aimed at improving security effectiveness by optimizing use of AIT. The field guide provides throughput calculations and target metrics for determining the operational capacity of the AIT system. PMB collects passenger throughput data and develops reports for TSA managers responsible for monitoring AIT performance and implementing corrective action.

Over the years, TSA has received a high degree of scrutiny regarding effectiveness of the AIT system. Prior audit reports from both the U.S. Government Accountability Office and DHS Office of Inspector General (OIG) highlighted diminished detection performance and inefficient screening capabilities of the AIT system. While TSA has committed to addressing these gaps, new threats continue to emerge requiring advanced security measures. We conducted this audit to determine to what extent TSA's monitoring of the AIT addresses needed capabilities.

## TSA Does Not Monitor AIT Operational Requirements

TSA does not monitor the AIT system to ensure it continues to fulfill needed capabilities for detecting non-metallic threat items concealed on air passengers. Specifically, although AIT met the requirement for system availability, TSA did not monitor the AIT system's probability of detection rate and throughput rate requirements set forth in TSA's operational requirements document. These issues occurred because TSA has not established comprehensive guidance to monitor performance of the AIT system.

Without continuous monitoring and oversight, TSA cannot ensure AIT is meeting critical system performance requirements — a consistent weakness

---

[2] An acquisition reaches full operational capability when there is a full deployment of capability and when the requirements established in the operational requirements document are demonstrated through test and evaluation.
[3] *DHS Guidebook, 102-01-103-01, Systems Engineering Life Cycle Guidebook*, April 18, 2016.

1   Sec., Privacy Impact Assessment Update for TSA Advanced Imaging Technology, 3 (Jan. 25,

2   2011), available at http://www.dhs.gov/xlibrary/assets/privacy/privacy-pia-tsa-ait.pdf. Millimeter

3   wave technology generates images based on the energy reflected from the body. *Id*. These

4   technologies are used to detect anomalies appearing on an image of a generic figure. *Id*. at 6. This

5   is consistent with the DHS Certification and Designation of L3's QATT, which is designed to

6   highlight "threats and anomalies on a generic mannequin that resembles a human outline for end-

7   user interpretation."

8          Moreover, nothing in the definition of ATR software requires an ability to distinguish

9   between objects located on the skin and objects located underneath the surface of the skin. Rather,

10  ATR software simply "produces a generic image of the individual being screened that is the same

11  as the images produced for all other screened individuals." 49 U.S.C § 44901(l)(1)(C) (2018); 49

12  CFR § 1540.107(d)(2) (2018). Thus, contrary to Plaintiff's allegations, there is nothing "unlawful"

13  about screening software which is capable of detecting objects underneath the surface of the skin.

14         In short, Plaintiff has alleged that L3's airport security screening software performed

15  precisely to the standards and specifications set out by Congress and the DHS. Because Plaintiff's

16  entire First Amended Complaint rests on his false contention that L3's screening software

17  unlawfully detected an object beneath his skin, it should be dismissed under Rule 12(b)(6) based

18  on a dispositive issue of law.

19         **3.     Plaintiff Cannot State The Elements For Any of His Purported Causes of**
20              **Action.**

21         In addition to the arguments advanced above, Plaintiff's First Amended Complaint should

22  also be dismissed for his failure to state a proper claim against L3. His claim of discrimination is

23  flawed in several respects, not the least of which is his failure to allege that he received any

24  unequal treatment as compared to other people in similar circumstances. His remaining claims fail

25  for the simple reason that L3's technology is "sold commercially" and "used in a civilian setting

26  by [the] Transportation Security Administration." Doc. No. 15, at ¶ 55. By extension, it is

27  undisputed that the TSA possessed and operated L3's QATT at the Phoenix-Mesa Gateway

28  Airport on August 9, 2018. Moreover, the Salimbas affidavit establishes that L3 did not exercise