No. 21-1312

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT**

---

MICHAEL GIBSON MUIR,

*Plaintiff-Appellant*

v.

UNITED STATES TRANSPORTATION
SECURITY ADMINISTRATION, et al.,

*Defendants-Appellees*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS

_____

REPLY BRIEF OF APPELLANT MICHAEL GIBSON MUIR

---

MICHAEL GIBSON MUIR
19 Inglewood Lane
Bloomington, IL 61704
muirone@yahoo.com
712-309-6121

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................ii

INTRODUCTION ............................................................................................1

SUMMARY OF THE ARGUMENT .................................................................1

ARGUMENT ...................................................................................................2

I.     PROCESS AND WAIVER ISSUES .....................................................2

       What the Hell is Water? ...........................................................................3

       Muir's Action Pierces Defendants' Liability Shield ...............................5

       Muir's "Trojan Horse" ...........................................................................10

II.    42 U.S.C. § 1983 ..................................................................................11

       Muir's Constitutional Right to Privacy .................................................11

       Defendants' Conduct Under Color of State Law ...................................15

       Defendants' Implicit Agreement .............................................................16

III.   29 U.S.C. § 794 ...................................................................................17

       Defendants' Unequal Treatment of Muir ...............................................18

       Muir's Private Health Information is Marital Property .........................18

       Where are Muir's AIT Scans? ................................................................19

IV.    IIED .....................................................................................................20

       Defendants' Extreme and Outrageous Conduct ....................................20

       Defendants' Reckless Indifference .........................................................20

       Muir's Severe Emotional Distress ..........................................................21

CONCLUSION ..............................................................................................23

CERTIFICATE OF COMPLIANCE ............................................................24

# TABLE OF AUTHORITIES

**Cases:**                                                                              Page

*Griswold v. Connecticut*, 381 U.S. 479 (1965)....................................................................11, 14

*Katz v. United States*, 389 U.S. 347, 361 (1967) ......................................................1, 11

*Olmstead v. United States,* 277 U.S. 438, 479 (1928) ...................................................1

*Riley v. California*, 134 S. Ct. 2473, 2490 - Supreme Court 2014 ...............................12

*US v. Jones*, 565 U.S. 400 (2012) ..................................................................................1

*Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294 (1967)........................................13

**Constitution, Statutes, Rules and Regulations:**

U.S. Const. amend. V.....................................................................................................21

U.S. Const. Right to Privacy .........................................................................................11

28 U.S.C. § 2680(a) ....................................................................................................5, 9

28 U.S.C. § 2680(h) .......................................................................................................5

29 U.S.C. § 794.............................................................................................................18

42 U.S.C. § 1983....................................................................................................passim

49 U.S.C. § 40103(a)(2) ...............................................................................................17

49 U.S.C. § 44901(l)(1)(A)(i) ........................................................................................1

49 U.S.C. § 46110..........................................................................................................2

Biometric Information Privacy Act (740 ILCS 14/1) ..................................................11

SAFETY Act (6 U.S.C. § 442-444)..........................................................................2, 5-9

**Other Authorities:**

*Nineteen Eighty-Four: A Novel*, George Orwell, 1949....................................1, 3, 13, 23

*The Odyssey,* Homer ................................................................................................3, 22

*This is Water,* David Foster Wallace, 2009 ............................................................3, 5, 23

## INTRODUCTION

"You asked me once, what was in Room 101. I told you that you knew the answer already. Everyone knows it. The thing that is in Room 101 is the worst thing in the world." - *O'Brien, 1984, Part III, Chapter V*.

What happened to Muir on August 9 and August 12, 2018, his personal "worst thing in the world", was wrong and the invasion of Muir's privacy and sanity by the Defendant-appellees using advanced imaging technology and proprietary artificial intelligence cannot be tolerated in Illinois or the Seventh Circuit. The DHS is knowingly operating outside the limits of the AIT search process as established by *Katz* and 49 U.S.C. § 44901(l)(1)(A)(i), and the judicial branch must intervene to address the "1984 problem" (see oral argument, *US v. Jones*, 565 U.S. 400) presented by the TSA Checkpoint scheme in order to bring the executive branch back into line with Illinois law, federal law, and the U.S. Constitution.

## SUMMARY OF THE ARGUMENT

"Experience should teach us to be most on our guard to protect liberty when the Government's purposes are beneficent. Men born to freedom are naturally alert to repel invasions of their liberty by evil-minded rulers. The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding." - Justice Louis D. Brandeis, *Olmstead v. United States,* 277 U.S. 438, 479 (1928).

Zealous and intent on not understanding the limits of their legitimate authority perfectly describes the co-conspirator Defendant-appellees. The facts are clear and Defendant TSA has it all on video, should this Court care to look. Muir was completely under TSA control, could not act in his own best interest, followed all TSA personnel orders, and did nothing wrong. But Muir

1

was punished in textbook, "Big Brother" style due solely to the unpredictable and uncontrollable symptom manifestation of his physical disability, and without any regard for his right to privacy, protected status, serious health emergency, and total innocence.

And because of the unconscionable actions of the co-conspirators, Muir is now left to live with the disturbing psychological effects of the TSA Checkpoint encounters and can no longer exercise his right to travel between the several states by air, simply because of his private marital healthcare choices regarding his disability.

Therefore, this Court of Appeals is Muir's last hope at regaining his ability to fly and it should grant him all requested injunctive relief, reverse the District Court's order, and remand his action to be heard under § 1983.

## ARGUMENT

I.    **PROCESS AND WAIVER ISSUES.** This review is *de novo* and the Court should treat this case as a matter of first impression because: (1) The District Court could not rule on key aspects of Muir's claims due to 49 U.S.C. § 46110, (2) The SAFETY Act has never been tested, (3) Only this Court of Appeals can view the secret SOP, and (4) Only this Court of Appeals can rule on Muir's Section 504 claim and grant him injunctive relief requiring the return of his scans.

All parties agree (see appellees' brief, p. 43), that this Court of Appeals is the court of first instance for this matter. Therefore, this Court should take judicial notice of the entire record below and refuse to prevent Muir from reasserting and or clarifying relevant facts because the TSA SOP is secret and Muir cannot know which facts are actually relevant until this Court rules on his incorporated SOP challenge.

The Court should also refuse to gag and hamstring Muir with regards to waivers as this matter involves secret security information, government defense contractor intellectual property, novel advanced technology, and a scalable abuse of legitimate authority made possible only by artificial intelligence, and is therefore, Orwell's *1984* aside, totally without precedent.

Muir can find no case law involving artificial intelligence deployed to replace a human being, no case law involving artificial intelligence deployed in a custodial interrogation setting, and no historical example of a sworn federal official having ever acted with such deliberate, reckless indifference as Defendant David P. Pekoske did when he knowingly violated federal rules and chose not to monitor in any way the error-prone, proprietary artificial intelligence responsible for analyzing two million passenger screening data images per day, so there is no pertinent authority Muir can cite.

**What the Hell is Water?**

Federal Defendants alluded to Troy and the Homeric Age. Therefore, with regards to Hephaestus and "the great might of the River Ocean", the words of a notable Central Illinoisan are instructive: "There are these two young fish swimming along, and they happen to meet an older fish swimming the other way, who nods at them and says, 'Morning, boys, how's the water?' And the two young fish swim on for a bit, and then eventually one of them looks over at the other and goes, 'What the hell is water?'" – *This is Water,* David Foster Wallace.

In deciding this case, Muir hopes the Court will consider the great River Ocean of money (see billions of dollars going to airlines in the CARES Act, including over 170 million dollars to Defendant Allegiant) that flows from us, the taxpayers, to the billion-dollar corporations running the air travel industry. In doing so, the more learned and experienced Court will educate Muir, an

3

obvious fish out of water, on exactly what this water is and why it's important that the river now seems to end at BlackRock (see Defendant Allegiant's Revised Corporate Disclosure Statement). BlackRock is not a natural sandstone amphitheater, a striking granite outcrop, or an ancient Hopi village. In this case, BlackRock is BlackRock, Inc., the world's largest "shadow bank" and asset manager, with over eight trillion dollars under its control. As of May 7, 2021, BlackRock, Inc. holds: 12.477% (2,048,300 shares worth around $500,000,000) of Allegiant Travel Company, the sole owner of Defendant Allegiant Air, LLC; over 647,000 shares of L3Harris Technologies, Inc.; and approximately 10,333,841 shares (worth over a billion dollars) of Leidos Holdings, Inc., the company that bought Defendant L3's proprietary ATR software on May 4, 2020 as part of a one billion dollar cash sale of L3's Security Detection and Automation businesses.

"What is the source of this insatiable thirst for wealth that seizes men's minds?" – Francesco Petrarca (1304-1374). As they spend their days floating atop the great River Ocean of easy money (not a penny of which got diverted to fix known problems with the ATR software), it's no surprise corporate Defendant-appellees had such difficulty identifying the obvious motive for their voluntary conduct (appellees' brief, p. 40): fulfilling their fiduciary duty to shareholders.

Corporate Defendants fulfilled their fiduciary duty to shareholders through voluntary participation in the common carrier airline business with a single-minded focus on profit actively achieved through <u>privatizing gains</u> (monetary profit; proprietary A.I. development at taxpayer expense through DHS contest; monopoly provider status of ATR software cycle updates to the DHS, immunity from suit through SAFETY Act certification granted by DHS without oversight) and <u>publicizing losses</u> (foisting defective proprietary A.I. software on unsuspecting air travelers which for years led to a known, quantifiable, unacceptable level of unnecessary and invasive pat-downs; eliminating the risk of legal action for TSOs abusing the flying public due to 28 U.S.C. §

2680(h) and the co-conspirators violating travelers' right to privacy using advanced technology; offloading of the future risk of terrorist attack-related lawsuits to the U.S. government, which due to 28 U.S.C. § 2680(a) basically can't be sued for anything).

BlackRock, Inc. and Defendants Allegiant and L3 asking "what the hell is an insatiable profit motive?" is like O'Brien and Defendants David P. Pekoske and TSA asking "what the hell is psychological warfare", and like the young fish asking "what the hell is water"?

The "1984 problem" presented here requires this Court of Appeals to utilize the full breadth of its checks and balances power and, under a *de novo* standard of review, scrutinize this entire case with a fresh set of eyes as though it was a young fish first discovering the water.

**Muir's Action Pierces Defendants' Liability Shield**

Defendant L3 raised the SAFETY Act (6 U.S.C. § 442-444) in appellees' brief and Muir agrees that this Court should rule on its applicability. Muir included a full copy of L3's relevant Certification and Designation (referenced in the following paragraphs) in his initial request for judicial notice (Case no. 1:20-cv-01280, Doc. 6) because it proves that Muir's injuries were foreseeable as L3 would only seek immunity from damages suits if there was a reason.

While Defendant-appellees created a shield from liability for their actions at the TSA Checkpoint that would make Hephaestus and Achilles envious, Defendant L3 is liable to Muir in this case because L3's proprietary ATR Software is not "QATT". Therefore, SAFETY Act protections do not apply to the proprietary artificial intelligence ATR software used to analyze the data images created by L3's millimeter wave "portal" because L3 did not receive "QATT" Certification or Designation from DHS for its proprietary ATR software, but only for its "portal".

With regards to L3's certified "QATT", DHS states: "The Technology is a security portal that uses millimeter-wave scanning technology to produce three-dimensional images of subjects to detect threat objects, if present, on scanned subjects… Also included in the Technology are the following support services: training, installation, maintenance services, manuals and technical documents."

DHS states that the Certified "Technology" is a "portal" (L3's ProVision mmw scanner, not the separate proprietary artificial intelligence ATR software that analyzes the data image produced by the "portal"). Additionally, ATR software is not listed in the "Also included" section. Therefore, L3's proprietary ATR software, which is a separate information technology security product sold to DHS in separate cycles, is not "included" in the Certified "Technology".

DHS also states (emphasis added): "The Technology *uses* Automatic Target Detection ("ATD") software, a software solution that analyzes scanned data and highlights threats and anomalies". DHS describes L3's proprietary ATR software as a "solution". "Solution" does not equate to inclusion, but relates instead to the privacy requirement that the "use" of ATR software fulfills. The word "uses" is not equivalent to "includes". The fact that L3's portal *uses* L3's proprietary ATR software does not mean that DHS "QATT" Certification of one product (a millimeter wave "portal"), extends to another related but separate product (proprietary ATR software used to analyze data images the portal generates).

And it is not only practical, but a current technological reality that checkpoint security hardware and software are treated separately. L3 openly states that its "portals" are altered to meet contract specifications and this includes, at DHS command, the ability to utilize different software to conduct the passenger screening image "search".

6

DHS did not administer a contest for new screening "portals", or "models of Technology", but specifically for a "Passenger Screening Algorithm", the software that "searches" passenger screening images produced by the "portal". Therefore, it is not only practical for DHS to contract for hardware that can utilize different software to perform the administrative search, but a practical reality because DHS has already taken concrete steps to develop its own algorithm to replace L3's proprietary software due to the constant false threat alarms that L3 has knowingly allowed to persist for years.

Also, a reasonable person would agree with Muir in his belief that high-level DHS and DOJ attorneys are very precise with language, especially with regards to complex matters involving liability and immunity from suit, and if they had intended to extend SAFETY Act protections to L3's proprietary ATR software, they would have listed "ATR software" in the "Also included" clause of the Certification. They did not.

The idea that "software" is automatically included might make sense if DHS had not deliberately created an "Also included" clause. DHS *did* create an "Also included" clause, which implies it did not intend for the Certification to automatically include anything other than what is specifically listed. "ATR software" is not listed and thus not included.

And, DHS was fully aware of the serious and ongoing problems with L3's proprietary ATR software when it Certified L3's "portals" on October 26, 2016, so it is perfectly logical to suggest that DHS did not intend to confer "SAFETY Act" protections on L3's software because DHS knew that L3's software performed very poorly, and that L3 had not taken satisfactory steps to fix the situation because false threat alarms continued to be one of the most significant factors contributing to delays at airport checkpoints.

It was held that the widespread deployment of AIT at airports constituted a "significant" change in DHS administrative procedure and as such required a notice and comment period. The privacy concerns raised during the course of that comment period ultimately led to Congress requiring ATR software to replace a human TSA agent during the "search" of the passenger screening image produced by L3's millimeter wave scanners. There was no requirement for the same contractor to manufacture the AIT "portals" and the ATR software, only that any "portals" DHS purchased utilized ATR software in place of a TSA agent in a booth (directly due to privacy concerns, not an "act of terrorism"). L3's continued reliance on its belief that it is lawful for its millimeter wave machines to detect objects underneath the skin is based on statutory language that refers to backscatter x-ray machines (whose use was discontinued at checkpoints due to overwhelming privacy concerns), not millimeter wave machines, whose use was continued precisely because they do not "alarm" on medical implants or artificial joints.

Muir accepts that backscatter x-ray machines are capable of detecting objects beneath the skin (those machines are still in use in military settings), but the ability of a domestic security "portal" to detect objects is not the same as the authorization to "search" a passenger screening image data outside of legally authorized limits. If Congress did not intend to limit the scope of passenger screening searches to the surface of the skin, it would not have included such specific language in the statute limiting searches to the surface of the skin. L3 must code its algorithm in order to comply with the laws regarding searches as well as imaging. And Muir accepts that his internal organs <u>might</u>, as a <u>potentially</u> unavoidable part of the millimeter wave scanning process, be imaged. But Muir does not accept that the passenger screening image data representing his internal organs underneath his skin is subject to search by L3's proprietary ATR software, and DHS would have exceeded its authority in granting QATT certification to the ATR software

because it violates federal law and the U.S. Constitution, and this Court of Appeals must direct the DHS to clarify that SAFETY Act protections do not extend to the ATR software because it is a separate information technology product, and that the use of ATR software was instituted not due to an "act of terrorism" under 6 U.S.C. § 444(2), but privacy concerns.

Defendant L3 is liable to Muir because it owned the proprietary ATR software used during the TSA Checkpoint AIT search process, does not have SAFETY Act Certification for its ATR software, does not have immunity from suits for money damages involving its ATR software, is not entitled to "Yearsley" immunity, and was an active and indispensable participant in the conspiracy to violate Muir's constitutional right to privacy during the pre-flight AIT search process.

Appellees' brief raised Defendant David P. Pekoske's liability in footnote no. 2 of their revised Jurisdictional Statement. Defendant Pekoske is liable to Muir because his reckless abuse of state power (choosing to violate federal rules and deciding not to monitor L3's A.I.) is not covered by the discretionary function exception of 28 U.S.C. § 2680(a) due to the "Special Relationship" and "state-created danger" doctrines. And Defendant Pekoske is not entitled to qualified immunity because his deliberate, indifferent actions also incompetently violated Muir's well-established constitutional rights (Defendant Pekoske was accordingly sued in his individual capacity and served at his home).

Muir objects to the unsupported new contentions in footnote no. 2 of appellees' revised Jurisdictional Statement. Specifically: (1) That a 42 U.S.C. § 1983 claim against Defendant David P. Pekoske was not raised in the trial court when all parties previously agreed that it was, (2) That Defendant Pekoske was sued in his capacity as a Federal Official when he was clearly

sued in his individual capacity, and (3) That a § 1983 claim against Defendant Pekoske is now suddenly a "legal impossibility", when he is the only non-corporate person named in this action (Defendant Wolf is no longer acting DHS secretary), the sole individual sworn to defend the Constitution, the sole individual responsible for the incompetent violation of Muir's rights, and the lead actor in the conspiracy that damaged Muir beyond the bounds of human decency.

Defendant Allegiant is liable to Muir because, at the time of the occurrence in question, Allegiant was a voluntary, for-profit, common carrier participant in the TSA Checkpoint scheme (Muir cannot begin the AIT search process until his Allegiant ticket is validated by TSA), Allegiant and Muir had a valid contract of carriage, and Allegiant has no valid claims to immunity from Muir's action.

## Muir's "Trojan Horse"

Not even Odysseus the Cunning could have devised a strategy to, as Federal Defendants' purport, "smuggle" Muir's incorporated petition for review challenging a final operating procedure of the TSA into this appeal, and Federal Defendants have cited no authority requiring or even allowing for the exclusion of Muir's relevant incorporated SOP challenge.

This Court of Appeals alone decides whether Muir has shown "reasonable grounds" for filing his petition for review outside of the 60-day window, and Federal Defendants' refusal to accept that Muir's post-traumatic stress did not manifest until almost a year after the August 9 and August 12, 2018 incidents (well after the 60-day period for filing a petition for review), combined with their ridiculous assertions that Muir's SOP challenge is improper only because he didn't fill out a sample template form, demonstrate that they simply don't want this Court of Appeals to look at their secret orders.

10

In Illinois, the transactional test emphasizes pragmatism. Muir's incorporated TSA SOP challenge is clearly intertwined with his cause of action and Federal Defendants' baseless assertion that Muir should have filed a separate challenge with this very Court at the same time his appeal from the District Court is being considered is in direct opposition to the theory of pragmatism and the preservation of judicial resources.

Therefore, this Court should conclude that Muir has shown reasonable grounds for filing his petition for review outside the 60-day window, and vindicate Muir's rights so that he is never again terrorized, coerced, and brutalized at the TSA Checkpoint due solely to his private marital healthcare choices regarding his disability.

**II.     42 U.S.C. § 1983.** Based on the pleadings and the reasonable inferences drawn from the pleadings under a *pro se* standard, Muir has stated a § 1983 claim because he has alleged facts demonstrating: (1) A valid constitutional claim under *Griswold* and *Katz*, (2) Conduct taken under color of state law, and (3) A silent agreement between Defendants to "look the other way" while simultaneously refusing to ever "take no for an answer", even for medical emergencies.

**Muir's Constitutional Right to Privacy**

Prong 1 of Muir's § 1983 action can only be ruled on by this Court and it turns on a violation of Muir's constitutional right to privacy under *Griswold* and *Katz* as they apply in the state of Illinois, which is unique because of the Biometric Information Privacy Act, which Muir raised below.

BIPA does not apply directly, but it must be a factor in the objective prong of the *Katz* test. In Illinois, citizens have the reasonable expectation of privacy with regards to fingerprints, i.d. photos, and other biometric information taken by employers. Therefore, the objective prong

of the *Katz* test is met because if Muir had a reasonable expectation of privacy with regards to his biometric information taken in the course of a contract for employment in Illinois, he must also objectively have it within a contract for carriage when it concerns his internal organs and human tissue beneath his skin in the context of his statutory right to travel between the several states by air.

Defendant-appellee L3 previously admitted that "L3's QATT is both authorized and designed to detect objects located directly beneath the surface of the skin" (Case No. 2:19-cv-05887 Doc. 19, pg. 6), and this Court of Appeals must stop the co-conspirators from any further unlawful invasion of Muir's privacy during the checkpoint search process.

Congress limited the AIT search to objects on the surface of the skin and if this Court of Appeals finds that the physical intrusion beneath Muir's skin of the electromagnetic millimeter waves emitted by L3's Portal is an unavoidable part of the screening process, then this Court must recognize that Defendant L3 was precluded from encoding the information representing Muir's internal organs as part of the search, and if that too was an unavoidable part of the process, then this Court must recognize that the encoded information regarding Muir's human tissue beneath his skin is private health information and was not subject to search by the proprietary artificial intelligence ATR software. Only this Court can view the TSA SOP and determine what limits, if any, the co-conspirators acknowledged, but it is clearly a violation of Muir's objective expectation of privacy in Illinois to have his internal, natural human tissue imaged and searched.

The Court held in *Riley v. California*, 134 S. Ct. 2473, 2490 - Supreme Court 2014, that simply searching for symptoms on a public medical website was a "private interest". Muir's

August 9 and August 12, 2018 AIT scans reveal his private interest in far more specific and personal detail than an internet search for symptoms. Muir's 2018 scans were taken during a serious medical emergency and contain private health information that must be returned to him.

"Those who wrote the Bill of Rights believed that every individual needs both to communicate with others and to keep his affairs to himself. That dual aspect of privacy means that the individual should have the freedom to select for himself the time and circumstances when he will share his secrets with others and decide the extent of that sharing. This is his prerogative not the States'. The Framers, who were as knowledgeable as we, knew what police surveillance meant and how the practice of rummaging through one's personal effects could destroy freedom." *Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, Justice Douglas, concurring.

In the instant case, the state usurped and destroyed Muir's freedom to choose when and where he shared his most private secret. This Court of Appeals must therefore hold the state and all Defendant-appellees to account because Muir's experience waiting for his AIT scan results during the seven seconds of the TSA checkpoint advanced imaging technology search is like Winston Smith's experience in Room 101 when he's threatened with "the worst thing in the world". In Winston's case it's the rat cage on his head, but in Muir's case it's having his most private and hidden weakness revealed during a serious medical emergency, and then having physical pressure applied to that exact location when he couldn't defend himself no matter what.

And Muir was psychologically damaged not in the basement of the Ministry of Love in Oceania in 1984, but at a public Illinois airport in the United States of America in 2018. This cannot be tolerated in our republic and appellees must be enjoined to cease all unlawful behavior.

Muir knows that Defendants believe they have not violated Muir's right to privacy, but they are wrong because they misconstrue the fundamental aspect of the constitutional right to privacy and Muir's privacy claim. Defendants focus on Muir's groin, which Muir concedes is the central point with regards to their deliberate indifference to his serious medical needs, but it is not the key to the § 1983 Prong 1 violation of his constitutional right to privacy. Muir's right to privacy turns on the private healthcare choice he and his wife decided inside the confines of their marriage contract. That marital choice with regards to Muir's healthcare is what is protected by the right to privacy, and that choice is what is unlawfully detected and revealed by the AIT.

The TSA Checkpoint AIT search violated the privacy of Muir's marriage, which is prohibited by Illinois law because the decision in *Griswold* protecting the constitutional right to marital privacy is expressly incorporated into the Fourth Amendment of the Constitution of the State of Illinois. This is the real Trojan horse in this case, and it is not Muir, Virgil or Odysseus who built it, but the duly-elected representatives of the 1970 Illinois legislature. And it is not Troy that is to be sacked, but the unlawful and unconstitutional provisions of the secret TSA SOP that led to Muir's unconscionable psychological damages.

Defendant-appellees' unequal treatment of Muir and violation of Muir's rights is best illustrated through the following comparison between Muir and the actual control group with regards to *Griswold*, which has nothing to do with biological sex or groins and, as Muir repeatedly stated below, everything to do with choice. When Muir is processed by the AIT during the security screening process, he is treated differently than other similarly-situated individuals who have made a private healthcare decision within the confines of their marriage in that his private marital healthcare choices are revealed by the advanced technology. This is the same as if Defendant-appellees allowed their proprietary technology to single-out every woman

who had chosen to terminate a pregnancy, used state power to reveal her private decision publicly, and then, without any due process, punished her for it in a cruel and unusual fashion in public, even though her private healthcare choice had absolutely nothing to do with her attempt to travel by air between the several states. This is unequal treatment towards Muir because other similarly-situated individuals who have made private healthcare decisions within the confines of their marriages do not have their choices exposed, and are not subjected to punishment solely because of their choices.

Muir has also clearly satisfied the subjective prong of the *Katz* test as all parties agree that Muir's hidden physical disability was hidden and private, and Muir intended it to remain so. Defendant-appellees cannot claim they didn't know about Muir's hidden physical disability because it is not their business to know in the context of a preflight search, and certainly not their business to discover and announce to the public at a busy airport using proprietary advanced technology.

**Defendants' Conduct Under Color of State Law**

Defendants' conspiracy was carried out under both federal and state law simultaneously, and Defendant's abuse of power at the TSA checkpoint is cloaked with state authority. In fact, the entire TSA checkpoint scheme falls apart without state authority because it is undisputed that TSA has no arrest powers. Muir could not say "no", even to protect his own physical safety, and he was coerced because of the threat of arrest. There is no debtor's prison in the United States and Muir was only compelled to act against his own best interest due to fear of arrest. Peoria County exercises its power to deprive citizens of their liberty under the authority of state law and this key element of the checkpoint scheme relies completely on local authorities acting under

15

color of state law. If Muir was not subject to arrest, TSA would have no power over Muir and he would have simply walked away from the people who ended up coercing and injuring him.

And to pretend that all Defendant-appellees didn't know and understand exactly what they were doing as local law enforcement stood idly by (though still ready to arrest Muir on Illinois soil, under authority of Illinois law, at a moment's notice from TSA personnel) while Muir's humanity and right to privacy were violated is preposterous.

The First Circuit decision in *Ruskai* misses a key point since that case had nothing to do with a serious medical need or life-threatening situation, and the required pat-down search, while offensive, did not endanger the plaintiff's life. Alternatively, the August 12, 2018 incident did endanger Muir's life and was far beyond a "slight intrusion" on his privacy, and while Muir may enjoy a reduced expectation of privacy at the Checkpoint, his right to privacy was not eliminated.

Defendant-appellees' supposed warning to Muir with regards to the required pat-down after a false threat alarm is absurd because at the time of the "warning", Muir had no right to refuse any TSA personnel order, and he had never been told that he couldn't say "no", no matter what. That's comparable to a man inviting a woman into his house and then saying, "I know I didn't tell you before you crossed the threshold, but you can't leave without my permission, and now I'm going to touch you, even though it may hurt", and then the man refuses to take "no" for an answer because of the prior so-called warning saying, "every woman knows she's subject to this process, it's common knowledge". This is the modus operandi of serial predators.

**Defendants' Implicit Agreement**

Defendants' must not be allowed to escape culpability by using their coordinated willful blindness, feigned ignorance, and deliberate indifference to Muir's rights as a protected

individual with a disability as defenses, or argue the outrageous theory that all Defendant-appellees weren't willful participants in a tightly-controlled, highly-complex, multi-agency, fifty-state, high-technology security scheme from which multi-billion dollar corporate defendants L3 and Allegiant derived massive profit.

Muir's right to fly is granted by Congress in 49 U.S.C. § 40103(a)(2), and while Defendant-appellees have a right to engage in interstate commerce, they do not have a right to engage in the airline business. All participation in the airline business in the United States on the part of the corporate Defendant-appellees is voluntary and willful.

Only this Court of Appeals can reveal whether or not the TSA SOP includes provisions for ensuring that the checkpoint security screening does not violate the rights of travelers dealing with serious medical emergencies and for Section 504 issues dealing with persons with disabilities. Muir confirmed that Peoria County failed to require the Sheriff's Department Deputies enforcing the law at Peoria Airport, which is not federal property, to train on Section 504 even though the TSA checkpoint is a federal program. To say that all entities weren't coordinating is absurd and the fact that travelers do get arrested by Peoria County for disobeying TSA personnel is proof of agreement because the checkpoint scheme continues to operate.

**III.    29 U.S.C. § 794.** Muir has pleaded facts that entitle him to injunctive relief requiring Defendant-appellees to stop discriminating against him. Also, Defendant-appellees do not have immunity from suit for injunctive relief requiring the return of Muir's AIT scans.

Muir was forced to go through it (the secret TSA SOP that is), to find out what was in it (or, more importantly, what was not in it, like, for example, any policy or reference to travelers' right to privacy, Section 504, physical disability, or serious medical emergencies) and it must be

noted that Muir could and would have avoided this entire situation, as he is by default forced to do now, if he had just been warned that his hidden disability could be exposed by the advanced technology used in the security screening process, and that once the process had begun, he could not unilaterally end the screening for any reason, including a serious medical emergency.

**Defendants' Unequal Treatment of Muir**

Muir is treated differently than other similarly-situated individuals, for example, individuals with a physical disability, because the unequal treatment towards Muir transforms the millimeter wave portal and AIT search process into an impassable architectural barrier similar to Room 101, which threatens his life and makes exercising his right to travel by air impossible.

Defendant-appellees violated Muir's right to privacy and put Muir's life at risk when they coerced him into having significant physical pressure applied to the exact site of his physical disability and serious medical emergency. When Muir's intestine is either incarcerated or partially strangulated due to his physical disability, he is in imminent danger.

Having a low-paid security guard with no medical training violate Muir at his right groin during a serious medical emergency solely because of his private healthcare choices is unequal treatment compared to the control group because in Muir's case the state puts Muir's life at risk.

**Muir's Private Health Information is Marital Property**

The information regarding Muir's human tissue beneath his skin is marital property and Muir's demand for the return of his August 9 and August 12, 2018 AIT scans falls outside the scope of the system of risk management established by the SAFETY Act, which applies only to causes of action for money damages. Defendant-appellees, including L3, cannot hide behind the

QATT certification from the DHS with regards to injunctive relief requiring the return of Muir's AIT scans to him because an injunction is not a cause of action, and Defendant-appellee L3 is not entitled to SAFETY Act protection with regards to the return of Muir's scans because it faces no risk of "loss" as defined by 6 U.S.C. § 444(5).

**Where are Muir's AIT Scans?**

"Privacy basically means concealment. People conceal things in order to fool other people about them. People want to appear healthier than they are… Medical records are increasingly being digitized… once something is digitized it's out there, your privacy is lost because, I'm not sure everybody realizes this, but digitized materials… tend to be in multiple copies on different servers." – Judge Posner: Privacy, *Big Think* interview, April 23, 2012.

Continuing on the track of Judge Posner's digital privacy thought-train, Muir must ask with regards to his digitized (P.S.D.I.) self: Where is the server that contains Muir's AIT scans? Who owns the server? How many copies of Muir's scans were made? How many copies of Muir's scans still exist? Over which fiber optic lines and network switches did the digital Muir travel during the approximately seven seconds of the AIT scan process before he even left Defendant L3's millimeter wave security portal? Where did the digital Muir go? Are there multiple servers? If so, where are they, who owns them and exactly who has permission to access them?

Only this Court of Appeals can answer these questions and in doing so, can make Muir as close to whole as possible by enjoining the Defendants to return his scans so he can utilize for his private healthcare the same information that Defendants took and used to discriminate against him, violate his rights, violate his dignity, violate his sanity, and permanently alter him forever.

**IV.    IIED.** Defendant L3 raised IIED in appellees' brief and Muir has alleged facts which entitle him to relief for IIED due to Defendants' outrageous conduct, Defendants' reckless indifference to Muir's serious medical needs, and Muir's severe emotional distress as a result of Defendants' conduct.

## Defendants' Extreme and Outrageous Conduct

"Machines are still very, very stupid." "The smartest AI systems today have less common sense than a house cat." - Yann LeCun, 2018 ACM A.M. Turing award winner.

Defendants' failure to monitor the proprietary ATR software is extreme and outrageous state conduct because, while failing to supervise a single TSA agent could result in injury, the failure to supervise L3's A.I. systemically affected every TSA Checkpoint simultaneously.

Defendant-appellees removed human beings and human judgment from the decision-making loop of a state custodial interrogation, threw Muir into the advanced technology snake pit to have his private health information judged by an ignorant A.I. Golem, and then turned their backs on him while his right to privacy was violated.

This merging of state and corporate power is techno-fascism because the A.I. responsible for the final custodial interrogation decision regarding a "pat-down" requirement is corporate intellectual property that Muir cannot hold to account since it is an artificial intelligence.

## Defendants' Reckless Indifference

Defendants had a *DeShaney* "Special Relationship" duty to Muir while he was in physical control of TSA and were therefore prohibited from deliberately disregarding Muir's serious medical needs because the state cannot create a dangerous situation for Muir (due solely

to the false ATR threat alarm, Muir was forced to have significant pressure applied to the exact site of his serious medical emergency) and then not protect him from the danger it created.

Defendant-appellees acted with reckless and deliberate indifference to Muir's serious medical needs and violated Muir's well-established Fifth Amendment liberty interest and Due Process rights by refusing to take "no" for an answer when the reason for the "no" was a serious medical emergency. If Muir is required to know the law, then so are all the Defendant-appellees, and their implicit agreement to "never take no for an answer" (again, the M.O. of serial rapists), regardless of the specifics of the situation, is what led directly to Muir's damages, and this ignorant, abusive, unlawful and tyrannical behavior at the TSA checkpoint cannot continue.

Muir's life was in TSA hands, and TSA and all Defendant-appellees used those hands not to enforce Muir's rights, but to brutalize Muir. The abuse of state power must be condemned in the strongest possible way and only this Court of Appeals has the power to look at the secret TSA SOP and confirm that "never take no for an answer" is the official state policy and therefore the moving force behind Muir's injuries, both at the federal and local level.

**Muir's Severe Emotional Distress**

Defendant L3 has acknowledged that Muir's congenital disorder "is no doubt a serious matter affecting Plaintiff's health…" (Case No. 2:19-cv-05887-DGC, Doc. 19, pg. 2) and the Honorable Judge McDade stated that "[t]he Court is sympathetic to Plaintiff's plight and psychological struggles…" ("Order and Opinion", Doc. 46, p. 32), so it is entirely unclear how Defendant-appellees could possibly continue to deny the severity of Muir's checkpoint screening experiences.

Any credible medical expert witness that Defendants could call at trial would have no choice but to testify that what happened to Muir was not only a serious threat to his life (Muir's 2018 scans prove his condition beyond any possible doubt), but also a clear example of cruel and unusual punishment that no man should be forced to endure as a member of a civilized society.

Regarding TSA's techno-barbarism, Muir finds the words of the prophet Theoclymenus appropriate; "Your faces, heads and bodies are wrapped up in night; your screams are blazing out like fire. The ornate palace ceilings and the walls are spattered with your blood. The porch is full of ghosts, as is the courtyard – ghosts descending into the dark of Erebus. The sun has vanished from the sky, and gloomy mist is all around." *The Odyssey*, Book 20 (20.353-60).

Muir previously submitted Maricopa County Police Incident Report #1801638 (Case No. 1:20-cv-01280, Doc. 6) detailing his serious health emergency on November 8, 2018 (which presented almost identical symptoms as Muir experienced on August 9 and August 12, 2018) at Chandler Gilbert Community College, and Muir experienced an even worse event that seriously threatened his life on June 22, 2018.

TSA agents not only invaded Muir at the exact site of the physical manifestation of his disability (the first and only people to ever do so and it must be noted that in any other situation Muir would have defended his physical safety with extreme prejudice and was only restrained from physically defending himself by the threat of arrest due to the total control of his actions by TSA personnel), but applied significant pressure to Muir's intestine when it had moved into his right scrotum (during this six-month window of serious medical danger that can and does result in death) while Muir was conscious and standing upright and being forced to act against his own best interest, and in doing so, instigated creation of "The Shadow", a dark and menacing

presence that haunts Muir's lower right corner of vision as a dark "ghost" who gives Muir the feeling as though it wants to "spatter the walls" with Muir's blood.

Muir calculated that "The Shadow" takes up more than 5% but less than 10% of his psyche and in calculating the stated compensatory damage amounts, Muir settled at 7.5% of his psyche being permanently altered. It is difficult to express in words the depth of invasion, humiliation, and violation Muir felt when his internal organs were outside of his body cavity and an artificial intelligence with less common sense than a house cat analyzed an advanced imaging technology millimeter wave scan and identified Muir's hidden, lifelong weakness, requiring a low-paid security guard with no medical training to seize Muir and detain him until another other low-paid security guard with no medical training applied pressure to the exact site of Muir's most painful and private malady at his life's greatest moment of weakness and vulnerability.

## CONCLUSION

The District Court erred in failing to grant Muir the opportunity to cure his pleadings under the stated Cause 42:1983 (see Doc. 49) before final dismissal of his action. Contrary to Defendant-appellees' assertion, the District Court was not required to divine entrails, travel to Delphi, or conjure a § 1983 claim "out of thin air", when simply looking at the case cover sheet classifying Muir's action as "42:1983" would have sufficed.

[This case] "is about simple awareness — awareness of what is so real and essential, so hidden in plain sight all around us, that we have to keep reminding ourselves, over and over: 'This is water, this is water.'" – *This is Water*. Muir prays this Court sees the water for what it really is, vindicates Muir's rights as a traveler and United States citizen, and puts "Big Brother" on notice that Muir will never again be terrorized by the state in TSA Checkpoint Room 101.

23

## CERTIFICATE OF COMPLIANCE

This document complies with the typeface and type-style requirements of Fed. R. App. P. Circuit Rule 32(b) because this document has been prepared using Microsoft Word 2010 in 12-point Times New Roman. This document complies with the type-volume limit of Fed. R. App. P. Circuit Rule 32(c) since this document contains 6,975 words.

Muir also clarifies that his opening brief contained, under Circuit Rule 32(c), 9,759 words and comprised a total of 87 pages, not 86 pages as reflected by the docket because Appendix p. A-47 (Doc. 43-1, Page 2 of the Declaration of George Salimbas) was not properly scanned.

DATED: this 8th day of June, 2021

Respectfully submitted,

_____s/Michael Gibson Muir_____
MICHAEL GIBSON MUIR

MICHAEL GIBSON MUIR
19 Inglewood Lane
Bloomington, IL 61704
(712) 309-6121